382 A.2d 105

**Robert B. SURRICK, Appellant,**

v.

**ZONING HEARING BOARD OF the TOWNSHIP OF UPPER PROVIDENCE et al., Appellees.**

Supreme Court of Pennsylvania.

Argued Dec. 6, 1974.

Decided Dec. 24, 1977.

Rehearing Denied Feb. 16, 1978.

184

Harry F. Dunn, Jr., Media, for appellant.

John P. Trevaskis, Jr., Media, for appellee, Tp. of Upper Providence.

John W. Nilon, Jr., Kassab, Cherry & Archbold, Media, for appellee, Citizens on Zoning.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, NIX and MANDERINO, JJ.

## OPINION

NIX, Justice.

This is an appeal from an order of the Commonwealth Court, *Surrick v. Zoning Hearing Bd. of Twp. of Upper Providence,* 11 Pa.Cmwlth. 607, 314 A.2d 565 (1974), affirming an order of the Court of Common Pleas of Delaware County which upheld the denial of appellant, Robert B. Surrick's, application for variance from the terms of the Zoning Ordinance of Upper Providence Township, Ordinance No. 34 of 1952, as amended, by the Zoning Hearing Board (Board) of Upper Providence Township.[1]  The dispositive issue is whether the township ordinance unconstitutionally excludes multi-family dwellings.  The Commonwealth

1. This Court's jurisdiction is based upon the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 204, 17 P.S. § 211.204 (Supp.1977–78).

Court, in affirming the lower court's order, held that it did not. For the reasons set forth below, we disagree.[2]

The history and facts of this case are as follows. Appellant sought to build apartments and townhouses on a 16.25 acre tract of land (four acres owned by appellant; 12.25 acres under agreement of sale with zoning contingency). The tract is located in an area designated A–1 Residential under the township ordinance, which permits only single family dwellings on one-acre lots. Appellant initially had applied to the Board of Supervisors of the Township to rezone the 12.25 acre tract to B-Business, the only ordinance classification permitting multi-family housing, to develop the site for apartments. The requested rezoning was denied after hearing held on September 2, 1971. Thereafter, appellant revised his plans to include the four acres of ground owned by him. He sought building permits, which were denied by the Building Inspector. An appeal was then taken to the Board requesting a variance and including a challenge to the constitutionality of the ordinance. The Board held hearings and subsequently denied the requested variance. It was this denial which ultimately resulted in the instant appeal.[3]

Upper Providence Township is a western suburb of Philadelphia, located about 12 miles from the center of the city.

**2.** Since we find the ordinance to be unconstitutionally exclusionary, we need not reach the other issues raised by appellant.

**3.** Pursuant to the statute as it then existed, the Board made no ruling on appellant's constitutional claims but did make the necessary findings of fact for the disposition of this issue. *See* Act of July 31, 1968, P.L. 805, art. IX, § 910, 53 P.S. § 10910 (1968).

This Section has subsequently been amended to provide:

The board shall hear challenges to the validity of a zoning ordinance or map except as indicated in section 1003 and subsection (1)(b) of section 1004. In all such challenges, the board shall take evidence and make a record thereon as provided in section 908. At the conclusion of the hearing, the board shall decide all contested questions and shall make findings on all relevant issues of fact which shall become part of the record on appeal to the court.

*Id., as amended,* 1972, June 1, P.L. 333, No. 93, § 910, effective in 60 days. (Footnotes omitted).

Providence Road bisects the township along a roughly north-south axis, and Route 1, a limited access highway, intersects Providence Road cutting across the southern quarter of the township in a generally east-west direction (*see* Appendix for a map of the township). The 1970 census set the township's population at slightly over 9,200; the total acreage of the township is approximately 3,800 acres. Approximately one-quarter of the township land is undeveloped.

The zoning ordinance in question has classified 43 acres, or 1.14% of the total township acreage, as a B district; in this B district apartments are permitted along with other essentially commercial uses,[4] and the record shows that the B district is already substantially developed. Except for a three-block stretch of B district farther south in the township, most of the B district extends eight to ten blocks from

4. The ordinance provides the following other uses in the B 1 zone:
  2. Club, Fraternity house or lodge.
  3. Educational, religious or philanthropic use, hospital, sanitarium or correctional institution.
  4. Farm; greenhouse; municipal or recreational use; railway passenger station.
  5. Store, personal service shop.
  6. Office, bank financial institution, telephone or telegraph business.
  7. Place of amusement.
  8. Hotel, restaurant, bakery, pastry, candy, confectionery or ice cream shop or factory.
  9. Public garage; sales, service, and repair shop and gas filling and battery service station when authorized as a special exception by the Board of Adjustment in accordance with Sections 1100 to 1104 inclusive of this Ordinance.
  10. Electrical shop; plumbing shop; paint store and paperhanger.
  11. Tailoring, dressmaking, shoe repairing.
  12. Jewelry, watches, clocks or optical goods.
  13. Undertaking and embalming.
  14. Private or minor garage.
  15. Accessory use on the same lot with and customarily incidental to any of the above permitted uses.
  16. Any use of the same general character as any of the uses hereinbefore specifically permitted, when authorized as a special exception by the Board of Adjustment in accordance with Sections 1100 to 1104 of this Ordinance.
  Zoning Ordinance of Upper Providence Township, Ordinance No. 34 of 1952, *as amended,* art. VII, § 701.

the intersection of Sandy Bank Road and Providence Road north along Providence Road and ends at the intersection of Rose Tree Road and Providence Road. Appellant's tract is just north of this intersection. The width of this portion of the B district is 175 feet on either side of Providence Road (*see* Appendix).

Article I Section 1 of the Pennsylvania Constitution protects the citizen's right to the enjoyment of private property, and governmental interference with this right is circumscribed by the due process provisions of the Fifth and Fourteenth Amendments to the United States Constitution. U.S.Const. amends. V, XIV; Pa.Const. art. 1, § 1; *Girsh Appeal,* 437 Pa. 237, 241 n. 3, 263 A.2d 395, 397 n. 3 (1970). In reviewing zoning ordinances, this Court has stated that an ordinance must bear a substantial relationship to the health, safety, morals, or general welfare of the community. *National Land and Investment Co. v. Easttown Twp. Bd. of Adjustment,* 419 Pa. 504, 522, 215 A.2d 597, 607 (1965), *citing, inter alia, Glorioso Appeal,* 413 Pa. 194, 196 A.2d 668 (1964). Thus, without expressly labelling it as such, this Court has employed a substantive due process analysis in reviewing zoning schemes and has concluded implicitly that exclusionary or unduly restrictive zoning techniques do not have the requisite substantial relationship to the public welfare. *See Concord Twp. Appeal,* 439 Pa. 466, 268 A.2d 765 (1970); *Girsh Appeal, supra.*

In *Twp. of Willistown v. Chesterdale Farms, Inc.,* 462 Pa. 445, 341 A.2d 466 (1975), this Court reaffirmed its conviction that suburban communities which find themselves in the path of urban-suburban growth cannot establish residential enclaves by excluding population growth.[5] *Willistown* in fact was no departure from precedent but merely a culmination of prior case law which had invalidated zoning techniques which seriously impeded or effectively "zoned out" population growth. *See National Land and Investment Co. v. Easttown Twp. Bd. of Adjustment, supra* (invalidating a

5. The Commonwealth Court decision in the instant case was handed down before our decision in *Willistown.*

four acre lot minimum); *Girsh Appeal, supra* (invalidating a zoning ordinance which totally excluded apartments); *Concord Twp. Appeal, supra* (invalidating two and three acre lot minima).[6] In *Willistown,* this Court was confronted with a zoning ordinance amendment which permitted multi-family dwellings on 80 acres out of a total of 11,589 acres in the township. In striking down this land-use scheme as "tokenism" and thus exclusionary, we extended the prohibition in *Girsh* to include not only *total* exclusion of multi-family dwellings but also *partial* exclusion, or "selective admission." *Twp. of Willistown v. Chesterdale Farms, Inc.,* 462 Pa. 445, 448–49, 341 A.2d 466, 468 (1975). In so holding, we set forth the following rationale:

> "The implication of our decision in *National Land* is that communities must deal with the problems of population growth. They may not refuse to confront the future by adopting zoning regulations that effectively restrict population to near present levels . . . ." *Id.* 462 Pa. at 449, 341 A.2d at 468, *quoting, Concord Twp. Appeal,* 439 Pa. 466, 474, 268 A.2d 765, 768–69 (1970).

This Court's ruling in *Willistown* rested upon the premise of *Girsh* that where a municipal subdivision "is a logical place for development to take place, it should not be heard to say that it will not bear its rightful part of the burden." *Appeal of Girsh, supra,* 437 Pa. at 245, 263 A.2d at 399. It also embraces the more basic proposition that a political subdivision cannot isolate itself and ignore the housing needs of the areas surrounding it. To implement these concepts, we adopted the "fair share" principle, which requires local political units to plan for and provide land-use regulations which meet the legitimate needs of all categories of people who may desire to live within its boundaries. Mr. Justice O'Brien, speaking for this Court in *Willistown,* stated:

**6.** For a review of this Court's decisions in this area prior to *Girsh Appeal,* 437 Pa. 237, 263 A.2d 395 (1970), *see* Comment, *The Pennsylvania Supreme Court and Exclusionary Suburban Zoning: From Bilbar to Girsh—A Decade of Change,* 16 Vill.L.Rev. 507 (1970).

"The New Jersey Supreme Court, in *Southern Burlington County NAACP v. Twp. of Mount Laurel*, 67 N.J. 151, 336 A.2d 713 (1975), in discussing a zoning ordinance which provided for a total exclusion of apartment dwellings, stated:

'We conclude that every such municipality must, by its land use regulations, presumptively make realistically possible an appropriate variety and choice of housing. *More specifically, presumptively it cannot foreclose the opportunity of the classes of people mentioned for low and moderate income housing and its regulations must affirmatively afford that opportunity, at least to the extent of the municipality's fair share of the present and prospective regional need therefor.* These obligations must be met unless the particular municipality can sustain the heavy burden of demonstrating peculiar circumstances which dictate that it should not be required so to do.' (Emphasis in original).

. . . . .

Nor are we convinced by Willistown's argument that Chesterdale's development plans would overburden its municipal services. Suburban municipalities within the area of urban outpour must meet the problems of population expansion into its borders by increasing municipal services, and not by the practice of exclusionary zoning."[7] *Id.* 462 Pa. at 449–450, 341 A.2d at 468.

**7.** Three members of the Commonwealth Court in *Willistown* reached the same conclusion:

"In pursuing the valid zoning purpose of a balanced community, a municipality must not ignore housing needs, that is, its *fair proportion* of the obligation to meet the housing needs of its own population and of the region." *Willistown Twp. v. Chesterdale Farms, Inc.,* 7 Pa.Cmwlth. 453, 469, 300 A.2d 107, 115 (1973) (opinion in support of affirmance), *quoting Oakwood at Madison, Inc. v. Twp. of Madison,* 117 N.J.Super. 11, 20, 283 A.2d 353, 358 (1971), *cert. granted,* 62 N.J. 185, 299 A.2d 720 (1973) (emphasis added).

The Court of Appeals of New York has also embraced the view that a zoning ordinance should adequately provide for the housing needs of the particular community and reflect a balanced consideration for regional housing needs. *Berenson v. Town of New Castle,* 38 N.Y.2d 102, 111, 378 N.Y.S.2d 672, 680–81, 341 N.E.2d 236, 241–242

■ Some commentators have expressed concern that judicial adoption of the "fair share" test will thrust courts into the role of super boards of adjustment, thereby usurping a function that is more properly legislative or administrative in nature.[8] Such concern shows a misconception of what we contemplate our role will be. In establishing the "fair share" standard, this Court has merely stated the general precept which zoning hearing boards and governing bodies must satisfy by the full utilization of their respective administrative and legislative expertise. We intend our scope of review to be limited to determining whether the zoning formulas fashioned by these entities reflect a balanced and weighted consideration of the many factors which bear upon local and regional housing needs and development.

■ The case law of this jurisdiction, as developed by this Court as well as the Commonwealth Court, both before and after our decision in *Willistown,* is instructive as to the relevant factors to which a court must look in conducting a review of zoning ordinances which are alleged to be exclu-

(1975). *See also, Bristow v. City of Woodhaven,* 35 Mich.App. 205, 192 N.W.2d 322 (1971) (invalidating a prohibition on the use of mobile homes).

8. *See, e. g.,* Ellickson, *Suburban Growth Controls: An Economic and Legal Analysis,* 86 Yale L.J. 385, 492 (1977); Payne, *The Delegation Doctrine in the Reform of Local Government Law, 29 Rutgers L.Rev.* 803 (1976). The rejection of the "fair share" test by Mr. Justice Roberts in his concurring opinion in the instant case appears to be somewhat belated. Mr. Justice Roberts' concurrence in our decision in *Willistown* cited with approval the opinion of Judge Mencer of the Commonwealth Court in that case. *Twp. of Willistown v. Chesterdale Farms, Inc.,* 462 Pa. 445, 454, 341 A.2d 466, 471 (1975) (Roberts, J., concurring opinion). It is clear from Judge Mencer's opinion in *Willistown* that he embraced the "fair share" concept. *Willistown Twp. v. Chesterdale Farms, Inc.,* 7 Pa.Cmwlth. 453, 469, 476, 300 A.2d 107, 115, 119 (1977) (opinion in support of affirmance); *see* note 7 *supra.* Furthermore, Mr. Justice Roberts' concern that our partial reliance upon New Jersey's *Mount Laurel* decision will press this Court into the land use planning business is exaggerated. We are not bound by New Jersey's purported "vast expansion of zoning principles." The "fair share" requirement, as we view it, is merely an analytical strand in the substantial relationship test already employed by this Court in reviewing zoning ordinances. *See National Land and Investment Co. v. Easttown Twp. Bd. of Adjustment,* 419 Pa. 504, 522, 215 A.2d 597, 607 (1965).

sionary. From this body of law a useful analytical method can be synthesized to aid our review. The initial inquiry must focus upon whether the community in question is a logical area for development and population growth. *Girsh Appeal, supra; National Land and Investment Co. v. Easttown Twp. Bd. of Adjustment, supra.* The community's proximity to a large metropolis and the community's and region's projected population growth figures are factors which courts have considered in answering this inquiry. *Waynesborough Corp. v. Easttown Twp. Zoning Hearing Bd.,* 23 Pa.Cmwlth. 137, 143, 350 A.2d 895, 898 (1976).

Having determined that a particular community is in the path of urban-suburban growth, the present level of development within the particular community must be examined.[9] Population density data and the percentage of total undeveloped land and the percentage available for the development of multi-family dwellings are factors highly relevant to this inquiry. *Twp. of Willistown v. Chesterdale Farms, Inc., supra; National Land and Investment Co. v. Easttown Twp. Bd. of Adjustment, supra; Waynesborough Corp. v. Easttown Twp. Zoning Hearing Bd., supra; DeCaro v. Washington Twp.,* 21 Pa.Cmwlth. 252, 254, 344 A.2d 725, 726 (1975).

Assuming that a community is situated in the path of population expansion and is not already highly developed, this Court has, in the past, determined whether the challenged zoning scheme effected an exclusionary result or, alternatively, whether there was evidence of a "primary purpose" or exclusionary intent to zone out the natural growth of population. *Twp. of Willistown v. Chesterdale*

---

**9.** Analytically, the present level of community development could be included under the initial inquiry as to whether a community was a logical area for population growth and development. Commentators have noted, and probably correctly so, that a particular community might lie along a corridor of population expansion but already be so highly developed that it cannot properly be called a "developing" community. Ackerman, *The Mount Laurel Decision: Expanding the Boundaries of Zoning Reform,* 1976, U. of Ill.L.F. 1, 13–15. For simplicity we consider the present level of community development as a separate analytical step.

*Farms, Inc., supra, citing, National Land and Investment Co., supra; Concord Twp. Appeal, supra.* Because the *Willistown* "fair share" test compels judicial examination of the *actual effect* of a zoning ordinance upon the availability of multi-family dwellings, evidence of exclusionary motive or intent, whether direct or circumstantial, is not of critical importance.[10] Thus, *Willistown* marked an implicit departure away from judicial inquiry into the motives underlying a particular zoning ordinance.[11] Our primary concern now is centered upon an ordinance's exclusionary impact.

**10.** In *Willistown* the only evidence of the township's exclusionary intent was the miniscule fraction ($7/10$ of 1%) of land available under that ordinance for the development of multi-family dwellings. *See Twp. of Willistown v. Chesterdale Farms, Inc.,* 462 Pa. 445, 450, 341 A.2d 466, 467 (1975). Furthermore the opinion of Judge Mencer of the Commonwealth Court in the *Willistown* case emphasized that the exclusionary impact in *Willistown* was the *inadvertent* result of the township zoning ordinance. *Willistown Twp. v. Chesterdale Farms, Inc.,* 7 Pa.Cmwlth. 453, 464–65 & n. 5, 300 A.2d 107, 113 & n. 5 (1973) (opinion in support of affirmance). It is possible to hypothesize a record replete with evidence of exclusionary intent but void of evidence of exclusionary impact. It would be difficult to conclude that our decision in *Willistown* forces invalidation of a zoning ordinance which has no exclusionary effect.

Different requirements pertain when it is alleged that a zoning ordinance perpetuates class-based or racially discriminatory housing patterns in violation of the Equal Protection Clause. In such a case, proof of this allegation would require evidence of racial or class-based motive. *See Arlington Hts. v. Metro. Housing Dev. Co.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). However, the instant case does not raise an equal protection challenge. Finally, it should be noted that the decisions of this Court which have struck down zoning schemes have focused the analysis upon the restriction on or exclusion of certain uses, not on the exclusion of certain classes of people. *Twp. of Willistown v. Chesterdale Farms, Inc.,* 462 Pa. 445, 341 A.2d 466 (1975) (partial exclusion of multi-family dwellings); *Concord Twp. Appeal,* 439 Pa. 466, 268 A.2d 765 (1970) (lot size restriction); *Girsh Appeal,* 437 Pa. 237, 263 A.2d 395 (1970) (total exclusion of apartments); *Exton Quarries, Inc. v. Zoning Bd. of Adjustment,* 425 Pa. 43, 228 A.2d 169 (1967) (exclusion of quarries); *Ammon R. Smith Auto Co. Appeal,* 423 Pa. 493, 223 A.2d 683 (1966) (ban on flashing signs); *National Land and Investment Co. v. East-town Twp. Bd. of Adjustment,* 419 Pa. 504, 215 A.2d 597 (1965) (lot size restrictions); *Norate Corp. v. Zoning Bd. of Adjustment,* 417 Pa. 397, 207 A.2d 890 (1965) (ban on billboards).

**11.** Recently the Commonwealth Court noted correctly that exclusionary intent is not an essential element in proving that an ordinance is unconstitutionally exclusionary:

■ In analyzing the effect of a zoning ordinance, the extent of the exclusion, if any, must be considered. Is there *total* exclusion of multi-family dwellings, which we disapproved in *Girsh Appeal, supra,* or is the exclusion *partial*? If the zoning exclusion is partial, obviously the question of the ordinance's validity is more difficult to answer. In resolving this issue, once again the percentage of community land available under the zoning ordinance for multi-family dwellings becomes relevant. This percentage must be considered in light of current population growth pressure, within the community as well as the region, and in light of the total amount of undeveloped land in the community. Where the amount of land zoned as being available for multi-family dwellings is disproportionately small in relation to these latter factors, the ordinance will be held to be exclusionary.[12]

It now remains to apply this analytical matrix to the facts of the instant case to ascertain if the ordinance in question reflects the proper consideration of the above-discussed factors. There can be little doubt that Upper Providence Township is a logical area for development and population growth. This conclusion is supported by the fact that the township is located a mere twelve miles or so from Philadelphia and is situated at the intersection of two main traffic arteries, one of which, Route 1, is a direct link with the city. *See Girsh Appeal, supra; National Land and Investment Co.*

Finally it is urged that Waynesborough has not shown the "exclusionary intent" by the Township claimed to be a requisite for a holding of unconstitutionality. . . . Intent is not, however, an indispensable element, as in a criminal case. When other facts and circumstances indicate an unreasonable restriction on the use of land for *multifamily dwellings, a conclusion that the ordinance is unconstitutional will stand without a finding of intent to exclude. Waynesborough Corp. v. Easttown Twp. Zoning Hearing Bd.,* 23 Pa.Cmwlth. 137, 143, 350 A.2d 895, 898 (1976).

12. We hasten to emphasize that the factors discussed thus far in no way comprises an exhaustive list. Nor is any one factor necessarily controlling. We anticipate that zoning boards and governing bodies, in the exercise of their special expertise in zoning matters, will develop and consider any number of factors relevant to the need for and distribution of local and regional housing. *See Southern Burlington Co. NAACP v. Twp. of Mt. Laurel,* 67 N.J. 151, 215 nn. 16–17, 336 A.2d 713, 747 nn. 16–17 (1975) (Pashman, J., concurring).

*v. Easttown Twp. Bd. of Adjustment, supra; Waynesborough Corp. v. Easttown Twp. Zoning Hearing Bd., supra.* The record shows that the township is not a high density population area; roughly one-quarter of the township land is undeveloped. Thus the township's present level of development does not preclude further development of multi-family dwellings. *See* note 9 *supra.*

The zoning ordinance in question results in a partial exclusion of multi-family dwellings, providing, as it does, 1.14% of the township land for development of multi-family dwellings. It is also significant that multi-family dwellings are only one of more than a dozen other uses permitted on this fraction of land. *See* note 4 *supra.* Therefore, this land is not set aside for the exclusive use of multi-family dwellings; development of such dwellings must compete with the other uses permitted in the B district. The above analysis leads inescapably to the conclusion that the facts of the instant case are legally indistinguishable from those in *Willistown.*[13] Thus we hold that Upper Providence Township

**13.** Appellees properly note that a presumption of validity attaches to any challenged zoning ordinance.

Nevertheless, this presumption is rebuttable and was never intended to foreclose full judicial review of constitutional issues. *See National Land and Investment Co. v. Easttown Twp. Bd. of Adjustment, supra,* 419 Pa. at 522, 215 A.2d at 607. Where, as in the instant case, the facts show an obvious dearth of land zoned as available for multi-family dwellings, the proponents of the zoning ordinance must put forth adequate justification for this zoning-created scarcity. Appellee's concerns about population burdens, water supply, and the environment, while understandable, do not justify the fraction of land now open for development of multi-family housing. In *National Land and Investment Co. v. Easttown Twp. Bd. of Adjustment, supra,* this Court was faced with similar proffered justifications and responded as follows:

Zoning is a tool in the hands of governmental bodies which enables them to more effectively *meet the demands of evolving and growing communities.* It must not and can not be used by those officials as an instrument by which they may shirk their responsibilities. . . .

Zoning provisions may not be used, however, to avoid the increased responsibilities and economic burdens which time and natural growth invariably bring.

*Id.* at 527–28, 215 A.2d at 610 (emphasis added).

has not provided a "fair share" of its land for development of multi-family dwellings. *Twp. of Willistown v. Chesterdale Farms, Inc., supra.*

We therefore direct that zoning approval for appellant's land be granted and that a building permit be issued conditional upon appellant's compliance with the administrative requirements of the zoning ordinance and other reasonable controls and regulations which are consistent with this opinion. *Id.*

JONES, former C. J., did not participate in the decision of this case.

POMEROY, J., did not participate in the consideration or decision of this case.

MANDERINO, J., concurred in the result.

ROBERTS, J., files a concurring opinion.

Appellee-intervenor's assertion that the greatest demand for housing in the township is for single-family homes on one acre lots rather proves too much. One need not probe too deeply into the economic mechanics of supply and demand to realize that the zoned-in scarcity of land for multi-family dwellings could easily create this type of demand.

APPENDIX

LEGEND

---- Twp. boundaries

____ Route 1

Subject Property

B District

ROBERTS, Justice, concurring.

I concur in the result. The Township's allocation of land clearly is not reasonable. See *Concord Township Appeal,* 439 Pa. 466, 268 A.2d 765 (1970); *Girsh Appeal,* 437 Pa. 237, 263 A.2d 395 (1970); *National Land and Investment Company v. Easttown Township Board of Adjustment,* 419 Pa. 504, 215 A.2d 597 (1965); *Township of Willistown v. Chesterdale Farms,* 462 Pa. 445, 341 A.2d 466 (1975) (concurring opinion of Roberts, J.). I cannot agree, however, with the majority's use of the notion of "fair share."

The majority asserts that this Court in *Township of Willistown v. Chesterdale Farms,* 462 Pa. 445, 341 A.2d 466 (1975) (plurality opinion) adopted the view that each municipality must provide a "fair share" of township land for "the legitimate needs of all categories of people who may desire to live within its boundaries." To the contrary, the "fair share" theory has never commanded a majority of this Court. Strong reasons exist for this Court to continue its refusal to endorse "fair share."

In *Willistown,* the plurality looked to *Southern Burlington County NAACP v. Township of Mount Laurel,* 67 N.J. 151, 336 A.2d 713 (1975), appeal dismissed and cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975), where the Supreme Court of New Jersey relied upon "fair share" in striking down an exclusionary zoning scheme. Although the New Jersey Court, like today's majority, expressed the hope that its examination of local zoning would not transform the court into an all-powerful board of adjustment, the history of the New Jersey Court's attempted enforcement of "fair share" suggests strongly that a theory so closely akin to court imposed regional zoning must convert courts into regional planning commissions.

In *Oakwood at Madison, Inc. v. Township of Madison,* 72 N.J. 481, 371 A.2d 1192 (1977), the New Jersey Court was called upon to explicate its decision in *Mount Laurel.* So devisive, apparently, was the attempt to translate the broad propositions of "fair share" announced in *Mount Laurel* into concrete and manageable standards, that the Court could

not reach a decision until after hearing argument four times over a period of nearly four years. The majority that emerged once more asserted that courts should not interfere with local zoning matters. Nevertheless, in the absence of regional planning and legislative or administrative controls, the Court required the judiciary to assume the task of ensuring that each municipality in a region allocate land in accordance with the current and anticipated needs of the region. 72 N.J. at 535, 371 A.2d at 1219.[1]

In *Oakwood,* the court emphasized that trial courts attempting to enforce *Mount Laurel* need not set precise quotas on the land townships must allocate for particular uses. 72 N.J. at 523, 543, 371 A.2d at 1213, 1223. That instruction of course did not relieve trial courts of the obligation to receive and analyze volumes of statistics concerning regional needs and to construct estimates of the acreage to be set aside by each municipality in the region. See id. at 525–29, 371 A.2d at 1214–16. The court must therefore engage in the essentials of regional zoning.

Indeed, in *Oakwood,* the trial court waded through three comprehensive planning studies which assessed and evaluated the housing, population, labor, income, transportation, real estate and educational conditions of the region, current and prospective, and which estimated the "fair shares" of Madison and its sister municipalities for the region's zoning needs. Based on these studies, the trial court determined that to meet its "fair share" of the housing needs of the region, Madison's zoning ordinance must "approximate in additional housing unit capacity the same proportion of low-income housing as its present low-income population, about 12%, and the same proportion of moderate-income housing as its moderate-income population, about 19%." Id. at 541, 371 A.2d at 1222. When a court makes such determi-

1. "But unless and until other appropriate governmental machinery is effectively brought to bear the courts have no choice, when an ordinance is challenged on *Mount Laurel* grounds, but to deal with this vital public welfare matter as effectively as is consistent with the limitations of the judicial process." *Oakwood at Madison, Inc. v. Township of Madison,* 72 N.J. 481, 535, 371 A.2d 1192, 1219 (1977).

nations and issues such orders, it is zoning, performing the role of a legislature or of a regional zoning board. That appellate courts, as well as courts at the trial level, are needlessly cast into this role compounds the error.

*Mount Laurel* relied in part on our own cases, such as *Concord Township Appeal, Girsh Appeal,* and *National Land and Investment Company v. Easttown Township Board of Adjustment,* supra, in striking down exclusionary zoning, but in introducing "fair share" went far beyond anything this Court had ever decided or suggested. At a time when New Jersey itself is limiting application of *Mount Laurel,*[2] it is ironic that the majority should adopt the New Jersey Court's vast expansion of the zoning principles applied in our cases when this Court has declined to embrace such an expansion independently.

The crucial distinction between our cases and those of New Jersey is that "fair share" transforms courts, both trial and appellate, into what Mr. Justice Pomeroy in his dissent in *Willistown* called "super boards of adjustment" and "planning commissions of last resort." 462 Pa. at 452–53, 341 A.2d at 470.[3] Nothing in law, policy or constitutional decision-making in land use disputes requires that we subject our judicial system to an unnecessary burden for which it is singularly ill equipped, or impose on regions and municipalities a "fair share" scheme of land use regulation which properly is for legislative and administrative bodies to develop. Our own case law has proved adequate to the task of preventing unconstitutional exclusionary zoning schemes without involving our judiciary in the endless complications

**2.** New Jersey faced *Mount Laurel* challenges in *Fobe Association v. Demarest Mayor and Council* (A129 September Term, 1975) and *Pascack Association Limited, Inc. v. Mayor and Council of Washington Township, etc.* (A130 September Term, 1975) both reported in 100 N.J. Law Journal 909 (October 13, 1977). In both cases, the New Jersey Court declined to apply *Mount Laurel* to municipalities almost fully developed.

**3.** The *Willistown* plurality's use of "fair share" is criticized in Note, The Inadequacy of Judicial Remedies in Cases of Exclusionary Zoning, 74 Mich.L.Rev. 760, 774 n. 66 (1976).

engendered by *Mount Laurel* in New Jersey.[4]  We would do well to continue to steer clear of "fair share."

**4.** Our cases have been cited with approval.  See e. g., *Golden v. Planning Board of Town of Ramapo,* 30 N.Y.2d 359, 334 N.Y.S.2d 138, 285 N.E.2d 291 (1972);  R. Rosenzweig, From *Euclid* to *Eastlake* —Toward a Unified Approach to Zoning Change Requests, 82 Dick. L.Rev. 59 (1977);  Comment, Zoning: Closing the Economic Gap, 43 Temp.L.Q. 347 (1970).