Bessie Layne, Appellant v. Zoning Board of Adjustment of the City of Pittsburgh, Appellee.

Argued October 9, 1981, before Judges ROGERS, BLATT and CRAIG, sitting as a panel of three.

*E. J. Strassburger, Strassburger, McKenna, Messer, Shilobod & Gutnick,* for appellant.

*D. R. Pellegrini,* Deputy City Solicitor, with him, *Mead J. Mulvihill, Jr.,* City Solicitor, for appellee.

OPINION BY JUDGE CRAIG, January 26, 1982:

Bessie Layne appeals from an order of the Court of Common Pleas of Allegheny County affirming a decision of the Zoning Board of Adjustment of the City of Pittsburgh (board), which denied her applica-

tion for an occupancy permit to use a building as a boarding house.

The applicant is the lessee of a two-and-one-half story, five-bedroom building which is occupied by seventeen boarders, to whom the applicant provides meals, lodging, clothes and personal care on a long-term basis. The boarders range in age from 50 to 101 years.

Under the Pittsburgh Zoning Ordinance, the building is located in the R-4 Multiple-Family Residence District, the location having been zoned for multiple-family residential use since 1923. Rooming houses and nursing homes are permitted in the R-4 zone, but boarding houses are not. Boarding houses are permitted in the C3 and C4 Commercial Districts and in the A1 Commercial-Residential Associated District.

The ordinance defines boarding houses, rooming houses and nursing homes as follows:

'Boarding house' means a building or portion thereof, other than a hotel, containing not more than one dwelling unit, if any, where meals and lodging are provided for persons not residing in the dwelling unit. . . .

'Nursing home' means a proprietary facility, licensed by the Commonwealth, for the accomodation of convalescents or chronically ill persons, in which such nursing care and medical services are prescribed by or are performed under the general direction of persons licensed to provide such care or services in accordance with Commonwealth laws. . . .

'Rooming house' means a building or portion thereof, other than an apartment hotel or a hotel, containing not more than one dwelling unit, if any, where lodging is provided without meals for persons not residing in the dwelling unit.

The board correctly found that the applicant's operation was a boarding house under the terms of the ordinance.

The applicant initially challenges the substantive due process validity of the ordinances, contending that it is unduly restrictive, unreasonable and lacks a substantial relationship to public health, safety and the general welfare because: (1) it excludes a "residential" use from all the primarily residential districts, and (2) other uses, more "commercial" in nature, are permitted in R-4 districts.

She contends that the ordinance recognizes boarding houses as residential uses, pointing to the C3 Commercial District regulations where the Section 955.02 listing of permitted uses includes both boarding houses and rooming houses under the heading "Residential Uses."

The ordinance also now contains provisions to allow group residences[1] and group care facilities[2] as

---

[1] Section 903.02(g) of the Pittsburgh Code defines as follows: *'Group Residence Facility'* An establishment that provides room and board to persons who are residents by virtue of receiving supervised specialized services limited to health, social *and/or* rehabilitative services provided by a governmental agency, their licensed or certified agents or *any* other responsible non-profit social service corporation. These services shall be provided in a family environment and only to persons who are children under eighteen years of age; physically or mentally handicapped of any age; or elderly, sixty two or more years of age *who are in need of supervision and specialized services.* This category shall not include facilities for persons *nineteen or more years of age,* released from or under the jurisdiction of a government bureau of corrections or similar institution. Supervision shall be provided by responsible adults *whose number shall be determined and certified by the sponsoring agency. However, one responsible adult shall be available for the residence* on a 24-hour-a-day basis *while the residents are on the premises.*

conditional uses in the R-4 zone. Claiming that these uses are similar to her boarding house operation, but are more commercial in character, the applicant thus contends that the ordinance is arbitrary because it forbids boarding houses in the R-4 zone, yet does permit those more commercial uses. However, we note that such group care facilities are not permitted automatically but only under the conditional use procedure requiring special planning commission scrutiny and council action on a specific basis.

One who challenges the constitutionality of a zoning ordinance has no light burden.[3] Before a zoning ordinance will be declared violative of substantive due process, the challenger must prove that it is clearly arbitrary and unreasonable, and has no sub-

---

The residents of the facility need not be related to each other, however, the number of residents shall be limited in accord with the provisions of the zoning district wherein the property is located. . . . (Emphasis in the original.)

[2] The same section also defines:

'Group Care Facility' An establishment that provides room and board to persons who are residents by virtue of receiving supervised specialized services limited to health, social and/or rehabilitative services provided by a government agency, their licensed or certified agents or any other responsible non-profit special service corporation. Supervision shall be provided by responsible adults whose numbers shall be determined and certified by a sponsoring agency. However, one responsible adult shall be available for the residence on a 24-hour-a-day basis. The residents of the facility need not be related to each other, however, the number of residents shall not exceed nineteen persons. (Emphasis in the original.)

This definition cannot apply to the use in this case because it is a business for profit.

[3] When the constitutionality of a zoning ordinance is attacked, there is a presumption that the ordinance is valid and that the municipal legislative body acted with the purpose of serving the public welfare. When the issue is whether the means employed are likely to serve the public safety and general welfare, this court will not

stantial relationship to a valid police power purpose. *Glorioso Appeal*, 413 Pa. 194, 196 A.2d 668 (1964).

In *Surrick v. Zoning Hearing Board of Upper Providence Township*, 476 Pa. 182, 188, 382 A.2d 105, 108 (1977), the Supreme Court stated:

> [T]his Court has employed a substantive due process analysis in reviewing zoning schemes and has concluded implicitly that exclusionary or unduly restrictive zoning techniques do not have the requisite substantial relationship to the public welfare.

Clearly, a total exclusion of boarding houses from the city would violate substantive due process. However, where as here, the City of Pittsburgh liberally permits[4] boarding houses in various zones, including the combined commercial-residential classification (A1) noted above, we cannot conclude that an ordinance which excludes them from the "residential" zones is arbitrary and unreasonable on its face as a matter of substantive due process.

This applicant's second argument is that not permitting her boarding house in a district which allows rooming houses constitutes a denial of equal protection of laws. The applicant notes that the only difference between boarding houses and rooming houses is that boarding houses serve meals and rooming houses do not; she contends that this lone distinction does not provide an adequate basis upon which a different zoning classification can be based.

---

substitute its judgment for that of the municipal legislative body where the ordinance is not clearly unconstitutional. The burden is on the challenger to prove that an ordinance is clearly unconstitutional. *Bilbar Construction Co. v. Easttown Township*, 393 Pa. 62, 141 A.2d 851 (1958).

[4] Indeed, because the yard and open space requirements in a commercial district are typically less rigorous than in R-4 Residential Districts, there is a basis for claiming that boarding houses are subject to milder regulations in some respects.

The applicant also has a heavy burden on this issue. We cannot forget that

> zoning classifications are largely within the judgment of the legislative body and the exercise of that judgment will not be interfered with by the courts except in cases where it is obvious that the classification has no substantial relationship to public health, safety, morals or general welfare.

*Gratton v. Conte,* 364 Pa. 578, 584, 73 A.2d 381, 385 (1950).

However, detailed study of the lean record here forces us to conclude that the applicant's burden was met through the testimony of Mr. Brown, the city zoning administrator, a full-time professional upon whose office the zoning ordinance confers significant responsibilities.

A key portion of Administrator Brown's testimony follows:

> MR. STRASSBURGER: So, in your opinion, if a rooming house is permitted in an R-4 zone, a boarding home should be permitted in an R-4 zone, also?

> MR. BROWN: Certain types. I don't necessarily agree that a full-care facility would qualify. A boarding home, in the general sense, where people merely live there, it's their place of residence and have at least one meal a day provided to them, I don't see much difference between that and a rooming house.

Mr. Brown indicated that the basic type of boarding house, as in this case, was not a full care facility. Although Mr. Brown testified that a boarding house was a type of use that "deserves more control," the gist of his testimony was that additional regulations might be desirable to deal with the "type of people" served by boarding houses which function as pre-

release or halfway houses for criminal offenders. That view of the Administrator is in accord with *Devereux Foundation, Inc. Zoning Case,* 351 Pa. 478, 41 A.2d 744 (1945) approving a similar classification of educational institutions.

However, such a distinction is not involved here because this boarding house, representing the general type as defined, is not of the class that, according to Mr. Brown, requires specialized regulations. In fact, Mr. Brown stated that he had "no problem" with elderly people being served meals in the R-4 district.

The burden of proving that there is no rational basis for a zoning classification can indeed be carried by introducing appropriate expert testimony.

As against the City Zoning Administrator's straight-forward acknowledgment of the absence of any meaningful distinction between the regular types of rooming houses and boarding houses, we have no evidence whatsoever, and only a moderate amount of argument, from the city to supply any basis for barring boarding houses from the R-4 district which permits rooming houses. Even if we consider a boarding house to have a "commercial" character because it may have a functional similarity to an inn or small hotel, or even as being akin to a restaurant in light of its meal-service attribute, the nature of a rooming house patently is no less inn-like and hence no less "commercial". In short, this record reveals that the boarding house's meal-service distinction embodies no real difference relevant to zoning purposes.

With not a bit of evidence in the record to present any meaningful difference, and the opinion testimony of a key city expert negating it, we must conclude that it would be an abuse of discretion to find that ordinary boarding houses can be rationally excluded from the R-4 districts where rooming houses and nursing homes are allowed.

The decision must be reversed.

266

### ORDER

Now, January 26, 1982, the order of the Court of Common Pleas of Allegheny County is hereby reversed, and this case is remanded with direction that the requested occupancy permit be issued as to zoning, subject to all other applicable laws, ordinances and regulations.

Judge PALLADINO did not participate in the decision in this case.