In Re: The Appeal of George R. Miller, Jr. from the decision of the Warminster Township Board of Supervisors.

George R. Miller, Jr., Appellant.

Argued November 19, 1981, before Judges MENCER, ROGERS and CRAIG, sitting as a panel of three.

*Jeffrey A. Drake,* with him *Charles S. Wilson, Charles S. Wilson & Associates,* for appellant.

*Elliot M. Drexler, Connolly, McAndrews, Stevens, Drexler & Corr,* for appellee.

OPINION BY JUDGE ROGERS, April 8, 1982:

George R. Miller, Jr., the owner of about 138 acres of land in Warminster Township, Bucks County, here appeals from an order of the Court of Common Pleas of Bucks County upholding the decision of the Warminster Township Board of Supervisors refusing his request for a curative amendment and rejecting his challenge to the township zoning ordinance. Miller's land is located in the R-1 Residence District where single family detached residences on 20,000 square feet lots are permitted. The curative amendment he proposes is that his land be placed in a new zoning district of his devising to be called S D, semi-detached, so that he might construct single family semi-detached dwellings; and he challenges the validity of the ordinance on the ground that it makes insufficient provision for the construction in the township of single family semi-detached dwellings.

The Board of Supervisors with whom the application was made (pursuant to §§609.1 and 1004(1)(b) of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§10609.1, 11004(1)(b)), conducted extensive hearings

after which it filed comprehensive findings and conclusions and, as noted, a decision adverse to Miller.[1] On Miller's appeal, the Court of Common Pleas affirmed the Board of Supervisors' action, Judge BIESTER writing an able and comprehensive opinion in support of the court's order.

The use of land for the placement of single family semi-detached dwellings is an expressly permitted use in the township's R-3 Residence District and its MF-2 Low and Moderate Income Multi-family District. Single family semi-detached dwelling use in the R-3 Residence District is, however, subject to restrictions which would appear facially to be substantial but concerning which there is nothing in the record indicating the extent of such impediment. Single family semi-detached residence use in the MF-2 District is not subject to the restrictions just mentioned.

Much consideration was given below to the question of whether single family semi-detached dwellings are a permitted use also in the MF-1 Multi-family District. Multi-family dwellings are defined elsewhere in the ordinance in terms which, without specifically naming single family semi-detached dwellings, would clearly include them. Article 9, Section 212(d) defines multi-family dwellings as:

*Multi-Family Dwelling (or Building):* A building having two or more dwelling units which may have either a common or independent outside access. Said units may be arranged horizontally one above the other or vertically separated by party walls. It is the intention to include within this definition of multi-family dwelling all recognized achitectural types or

---

[1] The disposition of this case has been delayed by the absence in the record certified to us of the Board of Supervisor's written decision and efforts, finally successful, to procure it.

structures accommodating two or more dwelling units in the same building whether the individual units are for lease or sale.

The term single family semi-detached dwelling is separately defined in Section 212(c), but not in terms inconsistent with the clear inclusion of this use in the definition of multi-family dwelling just reproduced. Furthermore, Article 9, Section 902 of the zoning ordinance includes a description of the "Area and Design Regulations" within the MF-1 District. Subsection 902(a)(i) is headed "Single Family Semi-detached Dwellings" and provides minimum lot area and other requirements for such use of lands in the MF-1 District.

The appellant points, however, to Section 1505 of the ordinance, which he contends prohibits single family semi-detached homes in the MF-1 District. Section 1505 is titled, and is in fact a "Table of Use Regulations." It lists uses one after the other vertically down on the left side of each page and lists horizontally across the top of each page by letter and number (*i.e.*, MF-1) the several zoning districts. Under each district designation appear the letters "N" or "Y", indicating whether the use in question is not, "N", or is, "Y" permitted in the designated district. With respect to the use, single family semi-detached dwelling, under the heading MF-1 District is the letter "N", and this the appellant says means that single family semi-detached homes are not permitted in MF-1. The Court of Common Pleas concluded, and we agree, that Article 9 of the ordinance describing in detail the characteristics of the MF-1 District, including in Subsection 902 (a)(i) regulations applicable to single family semi-detached dwellings constructed in the district, must prevail over the inconsistent, and possibly inadvertent, placement of an "N" under MF-1 in one of the tables of Section 1505. We note the use of land in the MF-1

District for multi-family use, including as we have concluded single family, semi-detached dwelling use, is subject to certain dimensional and building restrictions described in Section 1505 but these appear to be mild. In summary, the use of land for single family semi-detached dwellings is permitted in the R-3 Residence District and in the MF-1 and MF-2 Multi-family Districts, in the latter two without serious restrictions.

In *Surrick v. Zoning Hearing Board of Upper Providence Township*, 476 Pa. 182, 382 A.2d 105 (1977), also a case in which the charge was that the municipality's zoning provided insufficient provision for multi-family uses, the Supreme Court reviewed the cases involving exclusionary zoning theretofore decided and based thereon provided an analytical method for the review of this class of case.

"The initial inquiry must focus upon whether the community in question is a logical area for development and population growth. . . . The community's proximity to a large metropolis and the community's and region's projected population growth figures are factors which courts have considered in answering this inquiry." *Surrick, supra,* 476 Pa. at 192, 382 A.2d at 110. Unquestionably Warminster Township is a logical area for development and population growth. It is roughly bisected by U.S. Route 611 which is a multi-lane highway and the main road from Philadelphia to Doylestown. Just south of the township line is Exit 27 and just east is Exit 28 of the Pennsylvania Turnpike. U.S. Route I-95 parallels the township's eastern boundary line a few miles away. "Truck time" to Philadelphia is 30 minutes and to New York two hours.

The second inquiry of *Surrick* requires examination of "the present level of development within the particular community." Such matters as population density, the percentage of total developed land and the percentage available for multi-family dwellings are

relevant to this inquiry. *Surrick,* 476 Pa. at 192, 382 A.2d at 10. In *Surrick* the court further wrote:

Analytically, the present level of community development could be included under the initial inquiry as to whether a community was a logical area for population growth and development. Commentators have noted, and probably correctly so, that a particular community might lie along a corridor of population expansion but already be so highly developed that it cannot properly be called a 'developing' community.

*Surrick, supra,* 476 Pa. at 182, n. 9, 582 A.2d at 110, n. 9.

For a Pennsylvania township Warminster is small in area, containing 6550 acres, ten per cent of which is occupied by the U.S. Navy's Johnsville Naval Air Development Center. We learn from the United States Census records that the township had a population of 15,944 in 1960, of 34,770 in 1970 and of 35,543 in 1980. These figures might suggest that Warminster ceased being a developing community and became a developed community some time in the decade 1970-1980. It surely is densely populated. Volume 105 of the Pennsylvania Manual for 1980, beginning at page 548 provides information concerning Pennsylvania townships having populations in excess of 10,000, based on 1980 census figures. Only six of the 55 townships of the first class listed and four of the 58 townships of the second class listed have populations exceeding Warminster's. We also learn from the testimony in this case that there are 6,000 single family dwellings and 2,000 apartments in the township.

However, the record also shows that something more than ten per cent of the land area of the township, not including the Johnsville Naval Air Development Center, is undeveloped. In view of this circumstance and the fact that the record contains most im-

precise evidence concerning the characteristics and availability for development of the remaining undeveloped land, we are unable to say that Warminster is not still a developing community.

The third inquiry proposed by *Surrick*, is that of whether Warminster's zoning scheme effected an exclusionary result in the past or, alternatively, whether there is evidence of a "primary purpose" or exclusionary intent to zone out the natural growth of population. We conclude that the appellant has failed to bear his burden of demonstrating that Warminster's zoning scheme has either effected an exclusionary result in the past or now evidences an intent to zone out the natural growth of population. So far as the past is concerned, the doubling of the township's population between 1960 and 1970 and the presence of 2,000 apartment units bespeak consideration for and accommodation of multi-family uses. Further, at the hearings below, Miller presented the testimony of a local real estate broker and appraiser as an expert on the development of land in Warminster Township. On direct he testified that there was demand for real estate for residential use including for single family semi-detached dwellings. On cross-examination, he agreed that Warminster Township was one of 54 municipalities in Bucks County, that about ten per cent of the total population of the county lived in Warminster Township and that generally Warminster Township had carried its fair share of the housing demand in Central Bucks County.

The present allowance of ten per cent of the total land area of the township for single family semi-detached housing use belies the appellant's claim that the single family semi-detached, half acre zoning of his land must be changed because Warminster has made insufficient provision for single family semi-detached dwellings.

The appellant having failed to show that Warminster Township's zoning scheme has effected or is presently intended to effect exclusion of multi-family dwellings, we are constrained to, and do, affirm the order below.

### ORDER

AND Now, this 8th day of April, 1982, the order of the Court of Common Pleas of Bucks County is affirmed.

Judge PALLADINO did not participate in the decision in this case.