586 A.2d 1011

**BOARD OF SUPERVISORS OF MILLCREEK TOWNSHIP, Appellant,**

**v.**

**BAC, INC., Appellee.**

Commonwealth Court of Pennsylvania.

Argued Oct. 4, 1990.

Decided Feb. 6, 1991.

Richard W. Perhacs, Knox, McLaughlin, Gornall & Sennett, P.C., Erie, for appellant.

Victor R. Delle Donne, Delle Donne, Frank, Bails & Kirk, P.C., Pittsburgh, with him, Charles K. Moffatt, Erie, for appellee.

Before McGINLEY and KELLEY, JJ., and BARRY, Senior Judge.

McGINLEY, Judge.

This is an appeal by the Millcreek Township Board of Supervisors (Board) from an order of the Court of Common Pleas of Erie County (common pleas court) which reversed the Board's decision denying BAC, Inc's (BAC) request that it declare relevant portions of its Zoning Ordinance invalid and adopt BAC's proposed curative amendment.

BAC owns a tract of land located at the northeast corner of West Sixth Street and Peninsula Drive in Millcreek Township (Township). A two hundred foot portion of the tract fronts along West Sixth Street and Peninsula Drive and is designated as a Resort/Business District pursuant to the Zoning Ordinance. Twenty-three categories of commercial and institutional uses are permitted in a Resort/Business District including "licensed campgrounds and travel trailer parks."[1] Section 406A of the Zoning Ordinance.

1. The permitted uses in the Resort/Business District are:
(1) church, synagogue, temple; (2) state licensed or approved school or college; (3) library, museum, gallery; (4) apartments, condominiums, rental cottages, [excludes mobile home parks which are permitted in "C" Residence only]; (5) hotels, motels; (6) arenas, auditoriums, assembly and meeting halls; (7) township licensed campgrounds and travel trailer parks; (8) public swimming pools, beaches; (9) boating facilities, marinas, rental, repair and sale of boats; (10) fishing facilities and sale of fishing equipment and live bait; (11) country clubs; equipment and live bait; (11) country clubs; (12) baseball fields, basketball courts, golf courses, driving ranges, biking and hiking trails, miniature golf facilities, bicycle sales and rentals, bowling alleys, tennis clubs or courts, racquetball facilities, skating rinks, hunting and fishing clubs, soccerfields, skiing facilities, bocci fields, physical fitness courts; (13) eating and drinking establishments, restaurants, taverns, drive-in restaurants; (14) theaters, movie houses, excluding drive-in theaters; (15) auto rentals, gasoline service stations; (16) dance halls, amusement parks, picnic areas, playgrounds and nature parks; (17) fire stations, police stations, post office; (18) general stores, grocery mar-

The interior portion of the tract which abuts the two hundred foot strip is zoned B–Business, wherein a wide range of commercial uses are authorized.[2] Mobile homes and mobile home parks are not permitted in either district. The Zoning Ordinance only permits mobile home parks in C–Residence Districts. On December 8, 1987, BAC filed a challenge to the validity of the Zoning Ordinance and proposed four curative amendments to permit the construction of a mobile home park on its tract of land. BAC's proposed curative amendments were: 1) to amend Article III, Section 7 of the Zoning Ordinance by eliminating the dimensional requirement of recreational vehicles; 2) to eliminate the licensing requirements of subsection 10 of Section 803A of

kets, convenience stores, bakeries, farmers markets; (19) artisan and craft shops; (20) retail shops for the sale of gifts, souvenirs, photographic equipment and supplies, pharmaceutical products, sports equipment, beer and liquor, clothing, miscellaneous apparel, flowers, music, hardware, china, glassware, antiques, books, minor appliances; (21) beauty and barber shops, laundromats, financial institutions, dry cleaners, shoe repair, minor appliance repair, locksmith, travel and/or tour agency; (22) medical facilities; (23) and realtors.

**2.** The permitted uses in the B–Business District are:
(1) Any use permitted in "A" Business District; (2) eating and drinking establishments, including private clubs and social halls; (3) beauty parlor; (4) barber shop; (5) hotel or motel; (6) department, variety and dry goods stores; (7) grocery [including convenience] stores, meat and poultry market, fish market, fruit and vegetable market; (8) confection, dairy product and drug stores; (9) bakery; (10) miscellaneous home furnishing store; (11) household appliance store including radio and television stores; (12) office equipment and furnishings, office supply stores; (13) florist; (14) tobacco shop or newsstand; (15) photographic supply store; (16) gift, novelty, souvenir or bookstore; (17) research and development laboratory; (18) mall order houses; (19) direct selling organizations; (20) floor covering and carpet stores; (21) sporting goods store; (22) music store; (23) stationery store; (24) tennis club or courts; (25) drapery and material store; (26) china, glassware, metalware store, jewelry store and antique store; (27) clothing and miscellaneous apparel store, accessory shop, tailor, furrier; (28) furniture store; (29) hardware or paint store; (30) mailing, addressing, duplicating, blueprinting, small print shops, steno service; (31) plumbing and hearing store; (32) electric supply store; (33) bicycle shop; (34) locksmith; (35) drive-in restaurants where food and beverages are sold for off-premise consumption; (36) laundromat; and (37) hotel or motel with restaurant.

the Zoning Ordinance;[3] 3) to amend Section 406A to allow the permitted use of mobile home parks and mobile homes in Resort/Residential Districts; and 4) to rezone BAC's property zoned B–Business to C–Residence.

Hearings on BAC's challenge and proposed curative amendment were held before the Board on April 11, 1988, July 18, 1988, and August 29, 1988. The Board rejected BAC's challenge and curative amendments and concluded that the Zoning Ordinance was not exclusionary and provided for "a 'fair share' of mobilehomes and mobilehome park uses" and that "the ordinance makes adequate and reasonable provisions to meet the housing needs of that income group (moderate income) likely to purchase [a] mobilehome and locate same in mobilehome parks in Millcreek Township." Board's Conclusions of Law No. 10, dated January 23, 1989 at 23. On appeal, the common pleas court reversed the Board's decision without taking additional evidence. The common pleas court concluded that the Zoning Ordinance did not "adequately provide for the development of mobile home parks and effects a discriminatory and exclusionary effect on low-to-moderate income housing within the Township." Common Pleas Court Opinion, March 6, 1990, at 11.

■ Our scope of review where the common pleas court takes no additional evidence is limited to a determination of whether the Board of Supervisors committed an error of law, or a manifest abuse of discretion. *McKown v. Board of Supervisors of East Followfield Township*, 104 Pa.Commonwealth Ct. 428, 522 A.2d 159 (1987). The central issue to be determined is whether the Zoning Ordinance is exclusionary and therefore invalid because it does not provide for the Township's "fair share" of mobile homes and mobile home parks.

In *McKown*, this Court noted:

3. Section 803A–10 provides that "[d]uring the period of December 1st thru the last day of February, no Recreational Vehicle shall be occupied for a sum total of more than thirty (30) days and then at only such times as the service building is open and operating."

Our courts have developed a fair share analysis to assess the exclusionary impact of zoning regulations which are alleged to be exclusionary with respect to a particular type of housing. In *Surrick v. Zoning Hearing Board of Upper Providence Township*, 476 Pa. 182, 382 A.2d 105 (1977), the Supreme Court set forth a three-part fair share analysis. Under that analysis, the initial inquiry must focus upon whether the community in question is a logical area for development and population growth. Once it has been established that the community is in the path of growth, the present level of development within the community is then examined. If that community is situated in the path of growth and is not already highly developed, the third step is to ascertain whether the zoning ordinance has the practical effect of unlawfully excluding the proposed use.

*Id.*, 104 Pa.Commonwealth Ct. at 432, 522 A.2d at 160–161.

■ The Board argues that the population of the Township has virtually remained the same since 1980 and that the surrounding population of the City of Erie and Erie County has declined. The Board asserts that the Township is not a logical place to expect population growth. Maurice G. Waltz (Waltz), a professional planner, testified concerning the 1980 Millcreek Township Comprehensive Plan (Plan) which was promulgated for the development of the Township. The Plan projected the population growth for the Township through the year 2000. Notes of Testimony, August 29, 1988 (N.T. August 29, 1988) at 49–50. The Plan projected the following increases in the Township's population: 1980—51,500; 1985—56,000; 1990—60,000; 1995—65,000; and 2000—70,000. N.T. August 29, 1988 at 50. However, census data, not available at the time of the Plan's projections, established that the Township's population was 44,303 in 1980 and 45,160 in 1985. Although the Board found that the population projections in the Plan were too high and needed to be reduced by 80% in order to be more accurate, (Board's Findings of Fact No. 23) continuing population increase was indicated.

Further, Thomas Graney (Graney), a consultant in planning and community development, testified that from 1940 until 1986 the Township showed "a pattern of steady growth." [4] Notes of Testimony, July 18, 1988 (N.T. July 18, 1988) at 14. Graney also testified that the Township accounted for twenty-five percent of the population growth of Erie County in 1950; "thirty-six percent [for] the next decennium, ... 1960"; "[t]he next decennium, ... 1970, ... sixty-six percent"; and "finally from [19]70 to [19]80, forty-six percent." N.T. July 18, 1988 at 13. Although the Township's most recent rate of population growth is not as rapid, the population continues to grow. There is ample evidence that the Township is experiencing growth and that the first step in the "fair share" analysis has been established.

■ The Board next argues that the record fails to support a determination that the Township is largely undeveloped. The Board argues that the southern part of the Township is less developed and populated than the rest of the Township because there is no public water or sewage available. Conversely, BAC argues that the testimony of Graney supports the common pleas court's determination that there is suitable land available including BAC's tract for the development of mobile home parks.

The common pleas court determined that the "evidence, specifically the Township zoning map, indicates that the township is, to a large degree undeveloped" and that "[t]he amount of undeveloped land indicates ... the Township is currently underdeveloped." A review of the Board's findings reveals that they failed to make a finding as to whether or not the Township as a whole was highly developed. The Board found that there was sufficient land remaining in the C–Residence District "to meet current and expected demands." Board's Findings of Fact Nos. 20 and

**4.** Graney testified that the Township experienced a population growth from 1940 to 1986 as follows: 1940 to 1950—9,593; 1950 to 1960—11,-404; 1960 to 1970—8,505; 1970 to 1980—7,357; and 1980 to 1986—967. N.T. July 18, 188 at 13–14.

21. Further, BAC's reliance on Graney's testimony that the Township has sufficient undeveloped land suitable for development of mobile home parks is misplaced. *See* Brief For Appellee at 10. Graney testified that "I visited these sites [C–Residence] to ... determine whether or not there was land available to, in fact, develop additional mobile home parks." N.T. July 18, 1988 at 46. Graney's testimony dealt with his personal observations of the present level of development in the C–Residence District and not to the present level of development throughout the entire Township. Neither the Board nor the common pleas court made a finding concerning the "percentage of total undeveloped land and the percentage available for the development of the allegedly-excluded use." *Weiner v. Board of Supervisors of Lower Macungie Township*, 119 Pa.Commonwealth Ct. 485, 488, 547 A.2d 833, 835 (1988).

The Board argues that the Zoning Ordinance is not exclusionary and that the Township has adequately provided for the development of mobile home parks. Conversely, BAC argues that the Township has failed to provide its "fair share" of mobile home parks to meet the needs of the Township's current and projected low to moderate income families. Although it has not been established whether the Township is highly developed, we shall proceed to the third step of the "fair share" analysis to determine if there is sufficient evidence of record to establish "whether the zoning ordinance has the practical effect of unlawfully excluding the proposed use." *McKown*, 104 Pa.Commonwealth Ct. at 432, 522 A.2d at 160–161.

■ David Skellie (Skellie), director of the Erie County Department of Planning, testified that "[t]he Township ... in 1980 had twelve hundred [and] eighty-five mobile home units, which was seven point nine one percent of the entire number of units within [the] township." N.T. August 29, 1988, at 4–5. Skellie testified that "[b]ased comparatively with the county, the county has ... four point nine two percent of its total units as mobile homes and the state has three point four eight percent." N.T. August 29, 1988 at 5.

Finally, Skellie testified that "Millcreek had twenty-five point four percent of all the mobile homes in Erie County in 1980, but it only had fifteen point nine percent of population of the county in 1980." N.T. August 29, 1988 at 5. There is adequate support, based upon this evidence, to find that the Township does provide its fair share of mobile home parks.

BAC has also alleged that the current level of mobile home park development is insufficient to meet the current and projected population of low to moderate income families as a result of the exclusionary effect of the Zoning Ordinance. The common pleas court concluded that the record indicated that the cost of new and used mobile homes were affordable for families with low to moderate incomes, and that the Township failed to provide and meet the current demand for such housing. The common pleas court also concluded the evidence failed to indicate whether other forms of housing were available to low and moderate income families.

We must determine whether the record does, in fact, support the Board's determinations. John Ball (Ball), owner and seller of mobile homes, testified that the present buyer of a mobile home has an average income between thirty to thirty-five thousand dollars and that the cost of a mobile home is between eighteen and fifty thousand dollars. Notes of Testimony, April 11, 1988 (N.T. April 11, 1988), at 36. Ball stated that the mobile home industry considers mobile homes as "a choice of housing," not "as afforable [sic] housing." N.T. April 11, 1988 at 36. Graney testified that pursuant to 1988 statistics, families classified as low to moderate income families average between fourteen to sixteen thousand dollars of income per year, almost half the average income that Ball stated as the average income of a present mobile home buyer.[5] Based upon this testimony it

5. Mr. Delle Donne to Graney:
    Q. Give me the best answer you can. How much money per month would a person have to have available for housing to be classified as moderate income?

is clear that mobile homes are not the primary source of housing for low to moderate income families. Also the record supports the finding that the Township has accommodated the demand for mobile homes. Robert Sidman (Sidman), zoning and code administrator for the Township cited that as of June, 1984, the Township had thirty-three mobile home parks, consisting of a total of 1,379 sites, 1,342 of which were filled. N.T. August 29, 1988 at 19. Sidman further testified that at the end of 1987 the Township had thirty-seven mobile home parks, with a total of 1,477 mobile home sites, of which 1,446 were occupied. N.T. August 19, 1988 at 18. Sidman also testified that in addition to these thirty-one unoccupied sites there were "[a]pproximately a hundred and twenty spaces" in the Applewood Estates and "[a]pproximately twenty-four" additional spaces located in Crystal Court, all located in areas zoned C–Residence.

Additionally, Waltz, the professional planner, testified that besides mobile homes "apartments ... low priced condominiums" and "single family dwellings on the market of an older nature" are alternative types of housing units affordable to low to moderate income families. Although Waltz did not testify as to the cost of the different housing

> A. I would generally say, let's say, three hundred and below.
> Q. Three hundred and [sic] month and below for moderate income?
> A. Low-moderate income.
>  . . . .
> A. Generally speaking the old rule of thumb is about twenty to twenty-five percent of your income would go for shelter needs. So it's just a matter of you would multiply—three hundred times four is—twelve to fifteen hundred a month, would probably fit into my definition of low, low-mod. Which would be in the neighborhood of—you're probably better at math because I don't have a pencil in front of me. Fourteen, fifteen, sixteen per year.
> Q. Fourteen to sixteen thousand dollars a year is what you're using as a bench mark for low-moderate?
> A. That's what I'm using as in this context for the housing as I perceived to be out here, yes.
> Q. Now, you're talking about 1988 figures?
> A. Relatively contemporary figures.
> N.T. July 18, 1988 at 84–85.

units,[6] it follows that renting is also an alternative to buying for low to moderate income families. Waltz testified that the Township in 1980 had "a total of three thousand five hundred and ninety-nine renter occupied households ... which represents a total of twenty-two point one percent of the total units" in the Township. N.T., August 29, 1988, at 65.

The Board's conclusion that the Township provides a "fair share" of mobile homes, proportionate to its present and projected growth rate, is supported by the evidence. We must reverse the order of the common pleas court.

## ORDER

AND NOW, this 6th day of February, 1991, the order of the Court of Common Pleas of Erie County, at No. 739–A–1989, dated March 6, 1990, is reversed.

---

**6.** The common pleas court determined that "[a]bsent evidence of the cost of renting an apartment or purchasing a condominium, Waltz's testimony is of little or no evidentiary value to the effect of such units on the demand for low to moderate income housing." Common Pleas Court's Opinion, at 8–9.