[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On January 8, 1987, the plaintiff, Charles A. Rinaldi, applied to the Zoning and Planning Commission of the Town of Suffield (hereinafter the "Commission") for a zone change from R-25 to PDA for a 10.01 acre parcel located at the intersection of East Street (Conn. Rte. 159) and Conn. Route 190 in Suffield. The R-25 zone would allow for seventeen single family homes on this parcel while the PDA would have permitted up to eighty-five dwelling units. CT Page 254
On February 23, 1987 a public hearing was held to consider the application and various individuals testified for and against the application. The Commission was required to receive comments on the application from the Connecticut River Assembly and the hearing was continued for that sole purpose until March 23, 1987. On that date the report of the Connecticut River Assembly was read into the record. The matter was continued until April 20, 1987 when at a regular meeting of the Commission the plaintiff's request for a zone change was denied. On April 25th notice of the decision was appropriately published.
This parcel is located on the east side of East Street. Land fronting on both the east and west sides of East Street to the north and south is zoned R-25 residential. There is a parcel of land that is PDA zone consisting of two condominium developments, which lies to the east of the strip of land along East Street which is zoned R-25 and which lies to the north and east of the parcel which is the subject of the appeal. As noted, this parcel lies at the intersection of Route 190 and East Street. Land across Route 190 and abutting this highway on the south is zoned R-25.
AGGRIEVEMENT
Mr. Rinaldi is the owner of the land which is the subject of this appeal. The court finds Mr. Rinaldi has standing to prosecute this appeal by virtue of his ownership interest and that such interest would be affected as the result of the Commission's action in denying his requested zone change. Bossert Corp. v. Norwalk,157 Conn. 279, 285 (1968).
STANDARD OF REVIEW
In denying this request for a zone change, the Commission was acting in a legislative capacity. Burnham v. Planning Zoning Commission, 189 Conn. 261, 265 (1983); Stiles, et al v. Town Council of West Hartford, 159 Conn. 212, 218 (1970). There are many Connecticut cases standing for the proposition that on appeal, the court's review of the legislative decisions of a zoning authority must be limited and narrow in scope. Burnham v. Planning Zoning Commission, supra; Calandro v. Zoning Commission,176 Conn. 439, 440 (1979); Goldberg v. Zoning Commission, 173 Conn. 23,27 (1977); Goldfeld v. Planning Zoning Commission, 3 Conn. App. 172,178 (1985). The cases make a distinction between
decisions of the local authority which are administrative-special permit decisions, variance requests, etc. — and legislative decisions such as the request for a zone change as in this case.
But interestingly, according to one authority, when the cases are examined, the guidelines for the trial courts are not quite so CT Page 255 clear:
 ". . . the court has repeatedly returned to the legislative-administrative distinction to explain decisions, and particularly to enunciate differing degrees of discretionary power possessed by regulatory agencies. But looking at the standards the court (Connecticut Supreme Court) purports to apply as well as the cases themselves, it is hard to believe there is any significantly varying approach to judicial review of land regulatory decisions, regardless of the administrative, quasi-administrative, and legislative labels widely used by the Connecticut courts to `explain' different results. In general the court has been quite deferential to local administrative boards and commissions — — — although its reasons for being so have not prevented the court from stepping in when it feels it's proper . . ." Tondro, Connecticut Land Use Regulation, Section VIII, pp 262, 263.
It is still no doubt the law that the decisions of a zoning authority must be given great deference when the authority, as here, is acting in a legislative capacity. As the cases emphasize, the local zoning authority is familiar with local conditions. Suffield Heights Corporation v. Town Planning Commission, 144 Conn. 425, 427 (1957); Burnham v. Planning 
Zoning Commission, 189 Conn. at page 266.
A trial court cannot weigh the evidence or the credibility of witnesses or substitute its own judgment for that of the zoning authority; it must determine if there is a basis in the record for the decision of the authority. Cf. First Hartford Realty Corporation v. Plan Zoning Commission, 165 Conn. 533, 543 (1973). As the Burnham court said, "courts must not disturb the decision of a zoning commission unless the party aggrieved by that decision establishes that the commission acted arbitrarily or illegally" 189 Conn. at page 265. The question on appeal is not whether the court would have reached the same conclusion as the zoning authority but whether the record supports the authority's decision. On the other hand, the legislature has given aggrieved parties the right to appeal and the scope of review cannot be so narrowly defined as to take away that right. The court in Suffield Heights Corporation v. Town Planning Commission at 144 Conn. page 428 fairly summarized the law on this point:
 ". . . a court cannot take the view in every case that the discretion exercised by the local zoning authority must not be disturbed, for if it did the right of appeal would be empty. Therefore, the court can grant relief upon appeal in those cases where the local authority has acted arbitrarily or illegally and consequently has CT Page 256 abused the discretion entrusted to it."
Guided by these general principles, the court will examine issues raised in this appeal.
 III
EX PARTE EVIDENCE
The Commission closed public hearings on this matter on February 23, 1987 except for receipt of the Connecticut River Assembly Report. However, on March 5, 1987 the Commission received a memorandum from the Town of Suffield Board of Selectmen. The memorandum refers to motions passed by the board; it said "the Board of Selectmen recommends that a moratorium on single house subdivision and multiple unit housing be enacted by the Town." The moratorium is to remain in effect until the sewer system is upgraded and repaired and further construction on the sewer system is completed. The memorandum went on to say the board opposed any plan which involved the improvement, renovation or financing of residential sections of the town's public sewer system by private concerns or to the benefit of private developers.
This memorandum was not made part of the record and was simply attached to the plaintiff's brief as an exhibit. No formal motion was made by the plaintiff that the court should receive this as additional evidence outside the record (8-8 (e) C.G.S.A.). However, the defendant made no objection on this specific ground at the court hearing and an equitable resolution of this matter would seem to require the court to treat this issue on the merits.
The plaintiff contends that the Commission's receipt of this memorandum on an ex parte basis violated certain of his very fundamental rights. The case of Wadell v. Board of Zoning Appeals,136 Conn. 1 (1949) generally states the applicable law:
 "All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense. In no other way can it test the sufficiency of the facts to support the finding; for otherwise, even though it appeared that the order was without evidence, the manifest deficiency could always be explained on the theory that the Commission had before it extraneous, unknown but presumptively sufficient information to support the finding."
 136 Conn. at p. 9 quoting from I.C.C. v. Louisville 
CT Page 257 Nashville R. Co., 227 U.S. 88, 93. Also see Parsons v. Board of Zoning Appeals, 140 Conn. 290, 292-293
(1953); Pizzola v. Planning Zoning Commission, 167 Conn. 202, 207 (1974).
More specifically relevant to the issue before the court is the following language from the leading case of Parish of St. Andrew's Church v. Zoning Board of Appeals, 155 Conn. 350 (1967):
 The plaintiffs likewise urge consideration of five letters containing statements and opinions which were sent to the board some weeks after the public hearing. The board could not properly consider correspondence submitted after the public hearing without providing the necessary safeguards guaranteed to the applicants and the public. This means a fair opportunity to cross-examine witnesses, to inspect documents presented and to offer evidence in explanation or rebuttal. Wadell v. Board of Zoning Appeals, 136 Conn. 1, 9, 68 A.2d 152. Not to do so would deny the applicants the right to be fully apprised of the facts upon which the board is asked to act.
 155 Conn. at p. 358; also see Wasicki v. Zoning Board, 163 Conn. 166, 169 et seq. (1972).
As previously mentioned, the February 23, 1987 hearing before the Commission was continued to March 23 for the Connecticut River Assembly Report. The complained of ex parte memorandum was sent to the Commission March 5th. The March 23rd meeting was held and the Connecticut River Assembly report was read into the record. It was not until April 20, 1987 that the Commission at a regular meeting denied the plaintiff's request for a zone change. The question arises as to when the plaintiff became aware of the March 5th memorandum. If the plaintiff knew of the letter before the March 23rd meeting, or even the April 20th meeting, when the zone change was denied, it would seem fair that before he should be legally entitled to cry foul at the trial stage, that he show an attempt was made to reopen the hearing before the Commission concerning the ex parte communication. Otherwise, a party in this situation could simply wait until it receives the zoning authority's decision, raising the ex parte issue only when the decision is unfavorable. However, it would be unfair at this late stage to summarily dismiss the plaintiff's ex parte claim on this reasoning — the question was not addressed or even alluded to by the court or opposing counsel. The court merely mentions this concern as a possible aid to any appellate court reviewing this matter in the future with the idea of issuing prospective orders.
The cases seem to indicate that the mere fact that matters CT Page 258 were considered ex parte by a zoning authority doesn't require automatic reversal. For example in Wasicki v. Zoning Board, supra, the court noted that there was an extensive ex parte discussion between the applicants for an amendment to a site plan and the defendant zoning authority. Those opposed to the application were not present. Still the court did not end its discussion there but felt constrained to examine the transcript of the public hearing to determine, apparently, whether concerns raised at the hearing were the same ones discussed at the ex parte meeting.163 Conn. at p. 172.
In Parish of St. Andrew's Church v. Zoning Board of Appeals supra the court in the above quoted language explicitly held it was improper for the board to consider ex parte letters submitted after the public hearing. But although it supported the plaintiff on this point, it then proceeded to discuss the merits. It went on to hold the board's findings were reasonably supported by the record and that the plaintiff had not shown the board acted illegally, arbitrarily or in abuse of discretion.155 Conn. at pp. 358-360. This is not surprising since Parish of St. Andrew's Church cited the New York case of Wunder v. Macomber, 34 Misc. 281,228 N.Y.S.2d 552 (1962) as authority for its view on ex parte communications. Wunder v. Macomber likewise condemned the receipt of ex parte communications but found the zoning authority's decision sustainable without reference to the improperly received papers and ruled that the plaintiff suffered no prejudice from the receipt and consideration of those papers. Also see State ex re Cities Service Oil Co. v. Board of Appeals, 124 N.W.2d 809, 821
Wis., (1963).
In any event another line of cases seems to hold that reversal of the zoning authority's action is warranted only when the ex parte communication deals in some detail with the merits of the pending application and was in fact considered by the authority in its deliberations. Pizzola v. Planning Zoning Commission,167 Conn. at p. 207; Holt-Lock Inc. v. Zoning Planning Commission, 161 Conn. 182, 184-185 (1971); also see Association for a Better Cromwell, et al v. Cromwell Planning Zoning Commission, et al 9 CLT 31 at p. 13; Kloter v. Zoning Commission,26 Conn. Sup. 495, 500 (1967). Even Wunder v. Macomber supra and State ex rel Cities Service Oil v. Board of Appeals supra suggest this view of the law.
In this case the ex parte memorandum from the Board of Selectmen is addressed to the defendant commission and the Water Pollution Control Authority. It only "recommends" a moratorium on single house subdivision and multiple unit housing; the moratorium "is to remain in effect" until the sewer system is upgraded to accommodate the housing. The memo also states the Board is opposed to any plan "whereby residential sections of the CT Page 259 Suffield public sewer system be improved, renovated, or financed by private concerns or to the benefit of individual developers."
We don't have here the detailed ex parte communications thoroughly going into the very merits of the dispute, cf Wasicki v. zoning Board, 163 Conn. at pp. 169-174 or the language in Association for a Better Cromwell, et al v. Cromwell Planning 
Zoning Commission, et al supra where the court in referring to the ex parte letter said: "The blunt fact is that the very contents of the finding and conclusion of the PCZ, whether by accident or design, followed, in large part, the recommendations of the Milane letter." id at p. 13 (emphasis added); cf Pizzola v. Planning Zoning Commission supra at p. 207 which involved the ex parte reception of a traffic report from a party to the controversy.
Here the memorandum does not discuss the merits but merely makes a recommendation and there is nothing in the record to indicate the commission considered the memorandum in their deliberations or final decision. This is a case where the commission assigned no reasons for its action in denying the change of zone. At the April 20th meeting where the plaintiff's application was denied only the following language appears regarding the sewer capacity problem which was the concern prompting the memorandum:
 "Mrs. Russell: I'm rather concerned about the fact that we don't have a clear idea, clear information about whether or not they will be granted a sewer permit. I think that was made fairly clear during the hearing.
 Mr. Stanley: I guess that's still a question, whether or not . . . .
 Mrs. Russell: I understand. There is no clear indication from the sewer, the WPCA (Water Pollution Control Authority).
 Dr. Viets: ". . . our regulations are fairly clear as to what's demanded in order to zone PDA. Until those conditions are met, I believe the proof, it certainly seems to be the logical place for (not discernible) and density, but until we have all the requirements in place that are (not discernible) is a denial without prejudice." Page 2 of April 20, 1987 transcript of Commission meeting.
The ex parte correspondence in Holt-Lock Inc. v. Zoning 
Planning Commission supra did come from technical consultants to the zoning authority who were not opponents of the plaintiff's CT Page 260 application which is not the case here. But as in Holt-Lock Inc. the ex parte communication about sewer capacity and the implied lack thereof was something the commission had of its own knowledge or could have deduced from the public hearings. Also, the concerns of the Board of Selectmen could have been met by granting the application conditioned on a adequate sewer capacity. CF Holt-Lock Inc. v. Zoning and Planning Commission, 161 Conn. at p. 185., if they otherwise thought this was an appropriate approach.
The plaintiff makes no explicit claim that because the memorandum came from a political unit of the town there was any undue influence exerted on the commission members which in fact biased them against the plaintiff's application. An examination of the record doesn't suggest anything of the sort and the plaintiff did not avail himself of any opportunity he might have had under Section 8-8 (e) of the general statutes to explore this possibility by subpoenaing commission members for the court hearing.
 IV
DENIAL OF ZONE CHANGE
Under Section 8-3 (c) a zoning authority is not required to state its reasons for the denial of a zone change. Calandro v. Zoning Commission, 176 Conn. 439, 441 (1979); Cascio v. Town Council,158 Conn. 111, 115 (1969); Hall v. Planning Zoning Board,153 Conn. 574, 576 (1966). In fairness to the applicant and to trial courts faced with increasing numbers of administrative appeals "it would have been preferable, and of assistance to the court, if the commission had formally stated the reason or reasons for its action." Calandro v. Zoning Commission, 176 Conn. at p. 441. In such a case it is incumbent on the trial court to examine the record to determine whether it supports the commission's failure to grant the plaintiff's application for a change of zone. Hall v. Planning Zoning Board, 153 Conn. at p. 576, cf Cascio v. Town Council, 158 Conn. at p. 115 and Calandro v. Zoning Commission, 176 Conn. at p. 441.
The court will examine the record to determine whether there is support for the zoning authority's denial of the plaintiff's application for a zone change. On the merits of this issue the court will attempt to explore the areas by contention raised in both counsels' briefs.
1) Concern over traffic.
A change of zone is warranted only if it accords with the comprehensive plan and due account is taken of the police power purposes set forth in Section 8-2 of the general statutes. Hartford Realty Corporation v. Plan Zoning Commission, 165 Conn. 533, CT Page 261 541 (1973). Section 8-2 provides in part that zoning "regulations . . . shall be designed to lessen congestion in the streets." A zoning authority has broad discretion to deny a zone change based on traffic problems. Stiles v. Town Council,159 Conn. 212, 218, 219 (1979). What is determinative "is not the overall volume of daily traffic but `congestion in the streets', that is, density of traffic." Pecora v. Zoning Commission,145 Conn. 435, 440 (1958).
A Traffic Impact Report prepared by the plaintiff's traffic engineers was made part of the record and Ron Morra, one of the traffic engineers, testified at the public hearing as to the effect of the traffic that would be generated if the zone change were to be permitted. Traffic counts were taken in the months of December and January 1986. The conclusion of the report and of Mr. Morra's testimony was that the proposed development for a PDA zone on this parcel would "not significantly change the traffic characteristics in the area and can easily be accommodated by the existing roadway system." Return #11 p. 9, Transcript, Feb. 23, p. 5-12.
William Kweder, Planning Consultant to the Commission, submitted a written report (Record #6) where at page 2 he acknowledged that the plaintiff's traffic impact study was helpful and indicated that it appeared to him that the road system could accommodate any increased traffic that would be generated by the proposed zone change. Mr. Kweder went on to say in his report that:
 "The (plaintiff's) study is based on counts taken in January which may be low due to cold weather, neutral shopping and a closed Riverside Park. Possibly the volumes would be greater through the middle of the year and especially in the Fall. Those who live on East Street would probably attest to this analysis but the effect cannot be measured at this time."
At the hearing Mr. Kweder indulged in the same speculation; he testified that he "wondered what's going to happen when this traffic goes up, as it normally does in the summer months, in the Fall with the Big E and Riverside and all the other things going on. I don't know. It's just a question." These concerns were based on what people told him, he didn't really know the figures.
At the hearing further anecdotal testimony was received. One person said that traffic is heavy in the morning at this site and also when she returns home from work in the afternoon. Another man said that the new development's effect on traffic and its dispersal from the site should take account of the fact that when snow is heavy in January people in his existing condominium development have to use the same exit and entrance road to East CT Page 262 Street that occupants of the proposed development would use rather than one further to the north.
Mr. Morra in response to some of these concerns submitted further testimony at the public hearing. Regarding seasonal traffic variations due to Riverside and the Big E, Mr. Morra noted Big E is only open one week. Also the proposed zone change is still residential so that it would be quiet during the day. He felt the seasonal activities wouldn't really have much of an effect especially during the morning peak, although "it might have an effect on the afternoon peak". (Transcript, February 23, p. 52). (Emphasis added).
Mr. Morra discounted the increase in traffic congestion as to the south access road to East Street. He felt, in fact, that the proposed development would encourage people in the existing condominium complexes to use the north access route thus avoiding the possibility of added congestion at the south access road.
The above discussion summarizes all that appeared in the record regarding the traffic problem that might be presented by the zone change.
The plaintiff in its brief refers to Feinson v. Conservation Commission, 180 Conn. 421 (1980) and a case which followed its holding; Daughters of St. Paul, Inc. v. Zoning Board of Appeals, No. 231836, Bridgeport JD (6/17/87). He argues that this court like the Supreme Court in Feinson is "confronted (with) the issue of lay commissioners ruling on technically complex issues." The following language from Feinson is referred to:
 ". . . A lay commission acts without substantial evidence and arbitrarily, when it relies on its own knowledge and experience concerning technically complex issues . . . in disregard of contrary expert testimony, without affording a timely opportunity for rebuttal of its point of view." Id. at p. 429.
The plaintiff points to Daughters of St. Paul, Inc., where the court reversed a denial of a special exception by finding the reason of "the design if not in keeping with the surrounding residential structures" to be invalid. The judge found that the denial "was not based on facts in the record as it `clearly required expert testimony'."
But the plaintiff ignores other language in Feinson relevant to the issue he now raises. The court said:
 "The question before us is whether, on a subject as technically sophisticated and complex as pollution CT Page 263 control, commissioners who have not been shown to possess expertise in this area may rely on their own knowledge, without more, in deciding to deny a license to conduct a regulated activity . . . We have in the past permitted lay members of commissions to rely on their personal knowledge concerning matters readily within their competence, such as traffic congestion and street safety. . . We have permitted a commission composed of experts to rely on its own expertise within the area of its professional competence; . . . but in that case we recognized as well that expert testimony may be required when the question involved goes beyond `the ordinary knowledge and experience' of the trier of fact." 180 Conn. at pp. 428-429. (Emphasis added).
If the plaintiff's position is that in dealing with questions of traffic congestion a zoning authority cannot rely on its personal knowledge, the contention is clearly in error. What the plaintiff really seems to be arguing is that while the commission is not required to believe an expert witness, Manor Development Corporation v. Conservation Commission, 180 Conn. 692, 697 (1980), it must provide the zone change applicant a chance to rebut the commission's point of view on an issue raised by the record, if that position is adverse to the applicant. Since, according to the plaintiff, there was "no evidence" to suggest traffic congestion would be a problem, the court in its search through the record cannot use that factor as a reason to uphold the commission's decision.
But to repeat, if the question is, given evidence in the record raising this issue and adequate notice, can the commission, relying on its personal knowledge, reject the conclusion of the plaintiff's expert regarding traffic safety, the answer is an obvious yes. As Feinson makes clear on a basic issue like traffic congestion a zoning commission need not rely on expert testimony. A commission in any event is not required to accept the conclusions of an expert witness. Manor Development Corporation v. Conservation Commission, supra; Gulf Oil Corporation v. Board of Selectmen,144 Conn. 61, 65 (1956).
Here there is no question that the plaintiff received notice that particular issues of traffic congestion might be of concern to the commission. Mr. Kweder, Planning Consultant to the Commission, noted in his report (Record Ex. #6) that the plaintiff's expert did his traffic count in January and December "which may be low due to cold weather, neutral shopping and a closed Riverside Park." He went on to say that "possibly" traffic volumes would be greater through the middle of the year and into the fall "but the effect cannot be measured at this time." Mr. Kweder repeated CT Page 264 these concerns at the hearing. In fact, the plaintiff's expert, Mr. Morra, responded to these explicitly raised concerns at the hearing.
To place Mr. Morra's testimony in context, it is necessary to refer to the traffic report and the physical layout of roads adjacent to the subject site. Suffield Meadow Road is a semi-circular road with a north egress and a south egress on to a main highway called East Street. Suffield Meadow Road is the main service road for two existing condominium developments to the north and east of the subject site and also would be the means of egress on to East Street if multi-housing were permitted on the subject site pursuant to the requested zone change. In the traffic report (Record, Exhibit 6) it says:
 "The capacity analysis indicates that the only movement to experience any backup would be the left turn out of Suffield Meadow Road. However, this movement is still not at capacity with at least 126 reserve capacity during the highest peak hour volume periods. All movements on East Street operate at `A' level-of-service with very large capacity values."
If the zone change were permitted, the report goes on to note that the added traffic on Suffield Meadow Road would drop the level of service for the left turn from `C' to `D' — resulting in an additional 7 to 10 second wait per vehicle for those cars turning into East Street. Unfortunately all of this analysis is based on readings made for the months of December and January and no where does the traffic report define what a `C' level of service is compared to an `A' or `D' level of service.
In light of all of this, the commission could very well have found Mr. Morra's response to the problem of seasonal traffic raised by Mr. Kweder to be quite unsatisfactory. He said the zone change would still be residential so that it would be quiet during the day. Seasonal activities wouldn't have much of an effect especially during the morning peak but "it might have an effect on the afternoon peak." (February 23 Transcript p. 52, Rec. Ex. 14). As Pecora emphasized "overall volume of daily traffic" is not determinative but "congestion in the streets" and "density of traffic" are a particular concern at peak hours.145 Conn. at p. 440.
Obviously the applicant for a zone change has the burden of presenting evidence. In light of the reasonable question raised as to traffic congestion by Mr. Morra's testimony the commission could have found that the plaintiff's expert did not allay concerns over this issue. The court is not prepared to substitute its judgment for the broad discretion invested in zoning authorities CT Page 265 on the propriety of a zone change. First Hartford Realty Corporation v. Plan Zoning Commission, 165 Conn. 533, 540; Kutcher v. Town Planning Commission, 138 Conn. 705, 710.
The record supports a denial of the zone change on the basis of traffic congestion.
 2) The Multi-Family to Single Family Percentage Rule of the Plan of Development.
The 1967 Plan of Development provides that not more than 15% of the population of Suffield be housed in multi-family as opposed to single family housing. Such a Plan of Development is not binding on a zoning authority but only advisory, Faubel v. Zoning Commission, 154 Conn. 202, 207 (1966). That the commission considered the 15% ratio advisory is evidenced by the fact that at the time of the hearing the goal was exceeded to 17.7%. Mr. Kweder testified that if the zone change in this matter were to be approved and the 82 planned units were built on the subject site, 20% of the population would be living in multi-family units, about one-third over the goal. The plaintiff does not argue that a zoning authority cannot refer to the guidelines in a Plan of Development such as the one before the court in deciding whether to permit a zone change. Rather, the plaintiff argues that this particular guideline — the 15% rule — cannot be so used and the zoning authority had no right under Section 8-2 of the general statutes to incorporate it in the Plan of Development.
It is no doubt true that a zoning authority can only act in accordance with the authority provided through Section 8-2 in promulgating its zoning regulations. Arnold Bernard Co., v. Planning Zoning Commission, 194 Conn. 152, 159 (1984); Kavanewsky v. Zoning Board of Appeals, 160 Conn. 397, 404 (1971). Section 8-2 provides in relevant part that zoning regulations:
 . . . "shall be designed to lessen congestion in the streets, to secure safety from fire, panic, flood and other dangers, to promote health and general welfare, to provide adequate light and air; to prevent overcrowding of land; to avoid undue concentration of population and to facilitate the adequate provision for transportation, water, sewage, schools, parks and other public requirements" . . .
It would seem that there is merit to the respondent commission's argument that "the 15% goal adopted by the Town of Suffield bears a rational relationship to the purposes of zoning" as they are set out in Section 8-2 of our general statutes. The plaintiff's expert, Mr. O'Leary, noted a number of Connecticut towns have used such multi-family-single family percentage ratios. CT Page 266 Mr. Kweder in his report and testimony maintained the 15% ratio "provide(s) guidelines for local decision making in respect to a managed growth policy that will allow time for the orderly expansion of public facilities and services." (Record Ex. #6, p. 2).
The plaintiff cites two Connecticut cases for the proposition that zoning regulations must find specific authority within the language of Section 8-2. In Parish of St. Andrew's Church v. Zoning Board, 155 Conn. 350, 354, the court rejected a condition imposed on a special exception requiring the applicant to dedicate a strip of land to the town. It said the condition "does not come within the express authority of the board or relate to the standards promulgated in the regulations." This bizarre condition can have no general bearing on questions of proper or legal zoning regulation and is of little precedential use. More to the point is the case of Kavanewsky v. Zoning Board of Appeals, 160 Conn. 397
(1971). As the plaintiff notes, the Supreme Court held the commission erred in denying building permits because of a zoning regulation amendment requiring all residential lots to be at least two acres. The zoning authority's reasons for this two acre requirement were a response to the "demand of the people to keep Warren a rural community with open spaces and to keep undesirable businesses out." Id. at p. 403. The court, in rejecting these "reasons", noted that the two acre requirement "is not in accordance with the requirement of Section 8-2". Id. at p. 403.
Scores of zoning regulations throughout the state would be invalidated if the test were that they be specifically authorized and mentioned in the language of Section 8-2. The determinative question transcends a linguistic analysis but is concerned with the purpose behind a particular zoning regulation. Obviously the 15% rule has a direct relation to accomplishing some of the goals set forth in the statute, the question is does that particular provision go about it in a legally authorized way.
Kavanewsky v. Zoning Board of Appeals, supra, and the other cases cited by the plaintiff, City of Boca Raton v. Boca Villas Corp., 371 So.2d 154 (Fla., 1979) Beck v. Town of Raymond,394 A.2d 847 (N.H., 1978); Stoney-Brook Development Corp. v. Town of Freemont, (N.H., 1984) are really concerned with the problem of so-called "exclusionary zoning." (see generally, American Law of Zoning, 3d. ed., Anderson Vol. 2, 8.01-8.39. The language of two leading cases in this area make clear what the policy reasons are for holding exclusionary zoning to be illegal. Both cases, like Kavanewsky, invalidated minimum acre requirements and said zoning may not be used
 . . . "to avoid the increased responsibilities and economic burdens which time and natural growth invariably bring." National Land Invest. Co. v. CT Page 267 Kohn, 215 A.2d 597 (1965).
The court went on to discuss the desire of the residents to retain the rural character of the zoning district (see Kavanewsky at pr. 403) and then said this was "purely a matter of private desire which zoning regulations may not be employed to effectuate." The court went on to say the real question is, "whether the township can stand in the way of the natural forces which sent our growing population into hitherto undeveloped areas in search of a comfortable place to live?" The court's answer to the question was refreshingly decisive: "A zoning ordinance whose primary purpose is to prevent the entrance of newcomers in order to avoid future burdens, economic and otherwise, upon the administration of public services and facilities can not be held valid." 215 A.2d at p. 612.
The case of Appeal of Kit-Mar Builders, Inc. 268 A.2d 765,48 ALR3d 1190 (Pa. 1970) commenting on National Land said:
 "The implication of our decision in Natural Land is that communities must deal with the problems of population growth. They may not refuse to confront the future by adopting zoning regulations that effectively restrict population to near present levels. It is not for any given township to say who may or may not live within its confines, while disregarding the interests of the entire area 268." A.2d at pp. 768-769.
Such reasoning explains cases like Kavanewsky and similar reasoning has led courts to invalidate zoning regulations seeking to achieve so-called "growth control" in an improper manner. (See generally American Law of Zoning, Anderson, Vol. 2, Sections 10.01-10.20). Thus, the City of Boca Raton case held that a city charter amendment establishing the maximum number of dwelling units allowable within the city was unconstitutional. As Anderson notes, absolute population ceilings run counter to the "prevailing wisdom" that cities share the responsibility of accommodating increased population growth in a region. American Law of Zoning, supra. 10.10, p. 389-390. For similar reasons, the Beck court held invalid a "slow-growth" ordinance severly [severely] limiting the number of building permits land owners could be issued. The court said growth controls "should be the product of careful study and should be reexamined constantly with a view toward relaxing or ending them . . . good faith efforts to increase the capacity of municipal services should accompany growth controls . . . they must not be parochial, that is, controls must not be imposed simply to exclude outsiders . . . especially outsiders of any disadvantaged social or economic group. " 394 A.2d at p. 852.
The Stoney-Brook Development Corp. case follows the reasoning of Beck. There a development corporation applied for four building CT Page 268 permits but was only issued three. The basis for the denial was a town ordinance which provided that "the number of building permits to be issued for new dwellings shall be limited annually to 3% of the number of dwellings in the town at the start of the calendar year." The developer's argument that the 3% growth rate was not the normal, unrestricted growth rate but an arbitrary figure prevailed. The court recognized the town wanted to preserve its "small town environment and rural atmosphere" but the court noted the town is in the center of a fast growing area and limiting growth indefinitely to 3% is not guiding the town's growth in a reasonable way. "Growth control ordinances are intended to regulate and control the timing of development . . . not the prevention of development. 474 A.2d at p. 564.
An ordinance which doesn't completely exclude multiple-family housing can be defacto exclusionary if it allots so little space to a use that it can be considered tokenism. That was found to be the case in Surrick v. Zoning Hearing, 382 A.2d 105 (Pa. 171) where an ordinance permitted multiple dwelling on only 1.14% of the land. But such a claim can't be made here.
 "In proving defacto exclusion, the proponent bears the onus of showing that, even though the ordinance on its face permits a specific use, the ordinance as applied effectively prohibits such use throughout the municipality." Bernahm v. Bd. of Supervisors, 349 A.2d 484 (1975).
But the mere fact that the zoning regulations here provide for a 15% ratio between multi-family and single family housing in and of itself violates no rule of proper zoning. CF. Re Appeal of Miller, 444 A.2d 786 (Pa., 1982). And there can be no real comparison between the City of Boca Raton, Stoney-Brook Development, Inc., and Beck cases and the situation presented here by the 15% ratio. First it is a flexible guide and secondly there is nothing in the record to indicate the ratio operates as an arbitrary cap on general growth in the town. There is nothing in the record concerning the actual number of present single family houses vis a vis, multi-family units, the amount of available space in the town for future development of either type of housing, or the amount and intensity of development permitted over the years.
This is not a case where all multi-family housing has been excluded. Appeal of Girsh, 263 A.2d 395 (Pa. 1970). In this case a flexible ratio is being applied not a definite, numerical, rigid townwide limit on the number of multi-family units. cf. Silver v. Zoning Bd. of Adjustment, 225 A.2d 506 (1969).
But here the plaintiff cannot effectively argue that the 15% ratio operates as part of a secret agenda to limit town growth — at the time of the hearing the goal was already exceeded and land CT Page 269 to the north and east of the subject parcel had been rezoned for multi-family housing. Nor can it be argues that the Town of Suffield's policies on multi-family housing have shown a pattern of strictly limiting the percentage of such housing as compared to surrounding towns. See report of plaintiff's expert Michael O'Leary (Rec. Ex. #10, page 9).
In this case it cannot be said that the 15% goal bears no rational relationship to the purposes of zoning set forth in Section 8-2 of the general statutes or that it tries to effectuate an illegal policy of exclusionary zoning or impermissible growth control parcel as a practical single family residential zone.
3. The Conditions Surrounding The Defendant's Land
The plaintiff argues that the conditions surrounding the subject parcel make it unreasonable to deny the zone change. The plaintiff is the best exponent of his own argument on this issue which is set forth in his brief.
 . . . "(The subject parcel) . . is surrounded by 309 condominium units on two sides. In addition, a third side abuts an elevated state highway that leads to the I-91 interchange. The fourth side abuts another state highway with perhaps one residential and two commercial uses (a funeral home; a riding stable) across the street. The actions of both the state in creating the I-91 connector and the Commission in approving the zone changes for the abutting condominiums doomed this parcel as a practical single family residential zone. This is not a question of the highest and best use, it is a question of the only reasonable use.
(Plaintiff's Brief pp 13-14)
A further description of the subject parcel and the land surrounding it is warranted. The parcel is on the east side of East Street and from the intersection of East Street and Route 190 all the land along the east and west side of East Street is zoned R-25 single family. To the south the parcel is abutted by Route 190 with a right of way but south of Route 190 the land is zoned R-25. According to Mr. O'Leary, the defendant's land use analysis expert, "west of the site (subject parcel) across East Street is generally developed with single family houses fronting on Route 159 (East Street) where there is also located a horse riding and boarding stable," Rec. Ex. 10 pp 5-6. The existing PDA zone lies to the north and east of the subject parcel and is located behind the R-25 strip running along the east side of East Street — this strip of land running along East Street and zoned R-25 constitutes CT Page 270 approximately 14 acres. The proposed change of zone would extend the PDA zone west to East Street only at the southerly end of this R-25 strip which now runs along East Street and of which the subject parcel is a part.
Interestingly the plaintiff's claimed difficulties with continuing R-25 status for the parcel were self-created — he had the existing PDA zone to the north and east changed from R-25. Mr. Kweder also points to an interesting problem that would be presented by permitting the further advance of the PDA zone — if that were done how could the Commission deny PDA reclassification on the entire 14 acre strip of land running from Rte 190 north along the easterly side of East Street? (See Brief of Respondent Commission pp 5-7).
The plaintiff cites the venerable case of Euclid v. Amber Realto Co., 272 U.S. 365 (1906) and refers to the language of Justice Sutherland at p. 394 to the effect that apartment houses may be that type of use which could change the character of a single family residential area so that its desirability as a place for detached residences is "utterly destroyed". The plaintiff maintains by allowing the creation of two separate condominium projects in this area, the Commission created such a situation. Following this line of argument the plaintiff also refers to our leading case of Suffield Heights Corporation v. Town Planning Commission, 144 Conn. 425 (1957). He says the Commission's actions in reclassifying the abutting parcels to PDA, the physical conditions surrounding the subject parcel and the "acknowledgement by the Plan of Development that the parcel should be PDA" lead to the inescapable conclusion that the Commission erred in not allowing this zone change.[1] The plaintiff quotes from Suffield Heights, "A classification permanently restricting the enjoyment of property to such an extent that it cannot be utilized for any reasonable purpose goes beyond valid regulations and constitutes a taking without due process. 144 Conn. at p. 429. It would be well, however, to review the factual context of Suffield Heights and further examine its legal principles. The parcel there was substantially triangular in shape to the north of a business zone containing a shopping center. It was zoned Residential A and surrounded on three sides by Residential A zones but it was basically an interior parcel of land and the level of land to the east was twelve feet higher. The Supreme Court adopted the trial court's conclusions that denial of the plaintiff's application for a zone change "prevented it from making any reasonable use of that land and that the parcel was useless for residential purposes.144 Conn. at p. 425. The court noted that uncontradicted testimony at the hearing showed this land "was unsuitable for residential use and `entirely unfit for any other use but business'".144 Conn. at p. 428. CT Page 271
The plaintiff cites a series of cases in accord with Suffield Heights. Jefferson City v. O'Rouke, 394 So.2d 937
(Ala., 1981) held that it was improper to not rezone the plaintiff's parcel from residential to commercial. The property like the subject parcel was at the intersection of highways. Present zone classification relegated the use of the property as "nothing more than a buffer zone" with "no practical, suitable, or realistic use" Id. at p. 940; cf. Lakewood Development Co. v. Oklahoma City,534 P.2d 23 (Okla., 1975), plaintiff sought rezoning from residential to commercial; unreasonable not to do so as residential strip here located on a "sea of commercialism"; value of property as commercial use seven times more than residential; real estate appraiser testified he'd never build home in this strip. Id. at p. 26. Also, see Stokes v. City of Jacksonville, 276 So.2d 200 (Fla. '73), "The record is replete with evidence that the subject property is not suitable for single family residential zoning." Id. at p. 202, case where plaintiff wanted land rezoned commercial. Also, see Dixon v. County of Kane, 222 N.E.2d 354 (Ill., 1966) where as plaintiff says court ruled present zone not compatible with single family use, thus reclassification permitting service station should have been allowed.
All of the above is of course good law but it has nothing to do with the situation confronting the court in this case. These cases for one thing involve efforts to reclassify from residential to commercial. There is no claim by the plaintiff that the subject parcel, due to surrounding conditions, is unfit for residential classification he just wants a zone change permitting a denser residential classification. There is not an iota of evidence in this record to suggest the plaintiff can meet the heavy test of Suffield Heights. There is nothing to indicate that the subject parcel is useless zoned R-25 or that the denial of the zone change prevents the plaintiff from making any reasonable use of the land, 144 Conn. at pp 425, 428.
This would be a difficult argument to make. Mr. O'Leary the plaintiff's expert notes, as mentioned, that the land across East Street from the subject parcel is zoned R-25 and has single family houses and Mr. O'Leary significantly says
 "While no attempt has been made to substantiate this, it is the writer's opinion that a single family development on this parcel would result in a less desirable product; and it would result in a development having less than the median single-family value of such housing in Town." (Rec. Ex. 10, p. 10).
This statement in fact reflects the plaintiff's evidence and argument on this issue which is that leaving this parcel zoned R-25 would not promote its best possible use CT Page 272
But, "the maximum possible enrichment of a particular landowner is not a controlling purpose of zoning, "Samp Mortar Lake Co. v. Town Planning Zoning Commission, 155 Conn. 310, 315 (1967); State National Bank v. Planning Zoning Commission, 156 Conn. 99, 102 (1968).
On the basis of this record the plaintiff cannot prevail on this issue and his reliance on Suffield Heights v. Town Planning commission, supra is misplaced.
4. Density
At the public hearing, two members of the public expressed concern over the increased density that would be entailed by a zone change. The plaintiff maintains these concerns were addressed by the commission as a result of a change in the applicable regulations which permit only 5 units per acre in a PDA zone instead of eight. The change in regulations occurred after the Commission's decision but before the trial on the appeal in this court. Case law has held that the court must take into consideration this change in density regulations. McCallum v. Inland Wetlands Commission,196 Conn. 218, 223 (1985); Johnson v. Zoning Board of Appeals,2 Conn. App. 24, 26 (1984).
The court must determine whether the recently enacted Public Act 89-311 Sec. 2(a) changes the applicable law. The public act provides that "an application filed with a . . . planning and zoning commission . . . which is in conformance with the applicable zoning regulations as of the time of filing shall not be required to comply with nor shall it be disapproved for the reason that it does not comply with any change in the zoning regulations . . . taking effect after the filing of such application."
Here the application was denied and the plaintiff applicant now claims a change in regulations after the decision of the zoning authority removed the reason for the denial on at least the issue of density. This is the opposite of the situation the public act was trying to deal with — an applicant which otherwise complied with the regulations at the time of filing is later not in compliance because the regulations have been changed. Also, if Section (3) of the Public Act is examined concerning applications made to an inland wetlands agency, that section specifically provides that any appeal from an agency's decision "shall not be dismissed by the superior court on the grounds that . . . a change (in the inland wetlands regulations) has taken effect on or after the date of such decision." The implication gathered from reading these juxtaposed sections is that in zoning applications the zoning commission may not decide adversely to the applicant on the basis of a regulation change made between the time of the filing and the CT Page 273 time the decision is to be made. But unlike the inland wetlands situation, the language of the public act suggests the courts are still free to take account of changes in regulations made after the zoning commission's decision. Therefore, the court concludes the holdings of McCallum and Johnson are still binding on it in this matter.
On the specific issue of density, however, the defendant commission's brief points largely to the comments of a member of the public. Her remarks, as specifically concerned with the problems increased density might pose, have to do chiefly with the extensive springs and ground water in the area. She pointed out the problems the plaintiff had with regard to these factors in land he owns just east of the subject parcel. She said water in the area had caused "massive erosion problems." The density of development of the site (apparently the land to the east of the subject parcel) has made it impossible to develop the site because of the water situation without going on to private land belonging to a club.
What the problems are with regard to the development of land to the east of the subject parcel have nothing to do (at least as can be ascertained, from the record) with the conditions present on the subject parcel. In any event, the water erosion, springs and ground water problems make this really a situation where Feinson would apply. These questions are "technically sophisticated" enough to disallow the reliance of a lay commission on its own personal knowledge, Feinson v. Conservation Commission, 180 Conn. at pp. 428-429. Expert testimony seems "clearly required", Daughters of St. Paul v. Zoning Board of Appeals, supra.
The court cannot find that the record establishes any difficulties presented by increased density which would warrant respondent zoning commission's denial of the change of zone application. On the other hand, the reduced density requirements for PDA districts have nothing to do with the multi-family to single family ratio as the plaintiff suggests — that ratio is a guideline for townwide application. The plaintiff never sought to reopen the record to try to establish the significance that a reduced density PDA zone for this particular rather small site would have on the operation of the 15% ratio townwide.
In any event, there is no support on the record for the denial of the requested zone change on the basis of concerns over density.
5. Denial of Zoning ReClassification Because Plaintiff Could Build Apartments
One of the commissioners remarked that she was concerned that because of the zone change the plaintiff would be "putting in CT Page 274 apartments" (Rec. Ex. B, p. 2-4). These and other individual comments are not the equivalent of stated reasons for a zoning authority's actions, Welsh v. Zoning Board of Appeals, 158 Conn. 208,214 (1969). However, the plaintiff has addressed this matter and the court should therefore discuss it. The Zoning Regulations have the PDA zone entitled "Plan Development Apartments." The sections of the regulations allow a variety of multi-family uses in PDA zones including condominiums and apartments. But at the hearing the plaintiff testified he planned to build condominiums not apartments. Apart from the plaintiff's representations, there is an equally, if not more substantial, reason for the court not to consider any possibility that apartments could be built on the subject site as a ground for upholding the Commission's action. To allow condominiums but not apartments would raise the possibility of improper exclusionary zoning based on economic and class bias. See generally American Law of Zoning, Anderson, Vol. 2, 8.12 pp. 30, et. seq.
A concern that apartments might be built instead of condominiums is not warranted on the record in this case and would raise serious questions of legality. It is certainly not a reason to sustain the commission's decision.
SEWER CAPACITY
The sewer capacity requirements for a PDA zone are set forth in the Town of Suffield Zoning Regulations. Section 4.762 of those regulations reads as follows:
"4.762. Planned development zones and apartments shall be permitted only in R-25 zones, as generally shown on the plan of Development, where all buildings shall be connected to public water and public sewer systems before occupancy."
Mr. Paul Barnett of the Suffield Water Pollution Control Authority testified at the public hearing. The sewer capacity for the subject parcel was adequate for the 17 units that could be built in the R-25 zone but not for the proposed 82 units of a PDA zone. Mr. Barnett testified that only 22 units of capacity were available to this site. (Ex 14, 2/23 Tr. p. 15)
Mr. Rinaldi had proposed upgrading an existing pumping station and Mr. Barnett suggested two other feasible ways of increasing the capacity. The Pollution Control Authority was under orders from the State Department of Environmental Protection to upgrade the sewer capacity and Mr. Barnett testified that these improvements would be completed by July of 1992. (Ex 14 2/23/87 Tr. pp 14-23) CT Page 275
In reviewing this matter the Court must confine itself to the record and the facts and circumstances facing the Commission at the time of the hearing. As of that date there was inadequate sewer capacity on the subject parcel for PDA zone. It would thus certainly seem reasonable for the Commission to have denied the required zone change.
The plaintiff might argue that there would be adequate capacity by July, 1992 and before that date he could receive permission to make the necessary improvements, but again, this claim has to be judged from the perspective of the date of the hearing. In any event the plaintiff could also argue that if the zone change is granted sewer capacity concerns in the future could be fully met because actual approval for building on the site would require adequate sewer capacity.
In Lurie v. Planning and Zoning Commission 160 Conn. 295
(1971) the Court said:
 ". . . Where an exception of special permit is granted and the grant is otherwise valid except that it is made reasonably conditional on favorable action by another agency, or agencies over which the zoning authority has no control its issuance will not be held invalid solely because of the existence of any such condition." id cit p. 307.
The Court went on to hold that the action of the outside agency which will fulfill the condition must appear to be a probability. But Lurie certainly did not hold that because a zoning authority has the power to grant a special exception on the basis of the applicant being able to meet certain conditions by his actions, or that of another state agency that the zoning authority must grant the application.
In Jarvis Acres Inc. v. Zoning Commission 163 Conn. 41
(1972). The Court held the zone change should not have been granted. There was not enough evidence to show there was a "reasonable probability" certain improvements would be made in road conditions by a governmental agency id pp 50-51. But again, as in Lurie, Jarvis is certainly not authority for the proposition that a zoning commission acting in 1987, in a case where required sewer capacity is inadequate for a zone change, must grant the zone change because capacity will certainly be up to standard by 1992 or the agency in control of the situation might permit the applicant before that date to do the work himself. Neither do Lurie or Jarvis mandate a zoning commission to approve a zone change where the requirements of the zoning regulations are not met on the theory that site plan approval and building permits for the CT Page 276 newly zoned parcel could be denied pending compliance with regulations.
A zoning commission has broad discretion when it acts in a legislative capacity and the Court, on this point, refers to cases previously cited in this decision. Furthermore, the Commission can interpret its regulations as it deems fit as long as the regulations themselves seek to enforce a reasonable goal of zoning. Upholding the denial of this zoning change because of inadequate sewer capacity on the date of the decision creates no more onerous a task for the plaintiff than that of reapplying for a zone change when there is adequate sewer capacity for a PDA zone.
For this, and the other reasons previously discussed the Court dismisses the plaintiffs appeal.
JUDGE THOMAS CORRADINO